**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kenneth Wayne KNAACK and Milton**
**Segoviano, Defendants-Appellants.**

**No. 16271.**

United States Court of Appeals
Seventh Circuit.

April 11, 1969.

Rehearing Denied May 14, 1969.

Bernard B. Brody, Chicago, Ill., for defendant-appellant, Kenneth Wayne Knaack.

R. Eugene Pincham, Charles B. Evins, Earl E. Strayhorn, Chicago, Ill., for defendant-appellant, Milton Segoviano.

Thomas A. Foran, U. S. Atty., Nicholas M. Karzen, Chicago, Ill., for plaintiff-appellee, John Peter Lulinski, Michael B. Nash, Robert J. Breakstone, Asst. U. S. Attys., of counsel.

Before CASTLE, Chief Judge, FAIRCHILD and CUMMINGS, Circuit Judges.

FAIRCHILD, Circuit Judge.

Shortly after 12:30 a. m., April 21, 1966, Kenneth Knaack and Milton Segoviano were arrested in the vicinity of the Chicago Heights National Bank. They were charged with entering this national bank with intent to commit larceny therein.[1] They were convicted by a jury, and have appealed.

*Government version of the facts.*

At 12:30 a. m. police officers of Chicago Heights were dispatched to the bank in response to a mechanical alarm. The first to arrive were Officer La Faive and Sergeant Hogeveen. La Faive looked in the front door, on the east side of Halsted street, and saw a man running up an inside stairway. Hogeveen proceeded east along Seventeenth street (south of the bank) and around to the rear, or east end, of the bank. He saw the second floor door was open and two men standing below it under a fire escape. Other officers arrived at about that time. If Hogeveen and other officers are believed, the two men turned out to be Knaack and Segoviano.

East of the bank, a railroad right of way runs north across the block, Sixteenth street being next north from Seventeenth. Six foot cyclone fences run along the east and west sides of the right of way, from street to street. There is a hole or break in the westerly fence north of the bank.

The government's proof tended to show that the two men went north, then through the hole in the fence, then east across the tracks, and then north. They were followed by Hogeveen. Other officers arrived at the intersection of Sixteenth street and the right of way and the two men changed their direction. Then there was a confrontation on the right of way between Hogeveen and the two, whom he identified as Knaack and as Segoviano, with the latter of whom he was well acquainted. Hogeveen and Segoviano had drawn guns, but neither shot. Knaack and Segoviano separated. Hogeveen pursued Knaack and arrested him up against the east fence, with assistance from officers Petros and Jack, who had moved down from Sixteenth street. Segoviano ran toward Seventeenth, and was arrested within the right of way by Officer Alexander and merchant patrolman Angell.

Knaack was wearing an empty holster and a revolver was later found near

---

1. 18 U.S.C. sec. 2113(a), second paragraph.

where he was arrested. He had brown leather gloves, a cutting torch tip, and a pair of dark welding type glasses.

Segoviano was carrying a .45 automatic, a carbine, and ammunition. He had a walkie-talkie in his belt, and had in his clothing two concrete nails and two books of paper matches. Just before arrest he threw aside a knapsack containing more ammunition, a wrench, and a plastic face mask.

Inside the bank were found tools and acetylene welding equipment and there was evidence of an attempt to cut open the night depository. The inference could readily be drawn that persons had entered the bank for the purpose of larceny, and that Knaack or Segoviano, or both, had either entered it or were actively aiding those who had.

*Defense version of the facts.*

Each defendant, however, testified that he had come into the neighborhood independently and innocently, and had his curiosity aroused by the activity of the police and squad cars. Each denied being one of the two men followed by Hogeveen and each testified he was arrested in a different place and under different circumstances from those related in government testimony. Each denied possession of firearms and the other items of equipment referred to.

Knaack said he had been walking toward a tavern on Sixteenth street just west of the right of way. He watched what was going on from the westerly fence and was arrested there by Hogeveen.

Segoviano said he was driving west on Seventeenth street, but found it blocked by people and squad cars. He drove into a parking lot north of Seventeenth street and east of the easterly right of way fence. He left his car and saw a man running south through the parking lot and into the street. He saw Alexander arrest the man (claimed to be John Mangano) in the middle of Seventeenth street. Alexander arrested Segoviano on the sidewalk immediately thereafter. Segoviano did not know how his car had been returned to his home after his arrest.

In summary, each defendant claims he was a bystander who was arrested by mistake, in the confusion, but that thereafter the police were framing him by perjured testimony as to the circumstances of his arrest, and as to his possession of firearms and other equipment related to that which was found in the bank.

■ A jury question was presented by conflicting testimony. We shall state further details in discussing the points which defendants argue.

■ 1. *Reference to a previous arrest of Segoviano.* Hogeveen testified that he recognized Segoviano and called him by name during their encounter on the right of way; that Hogeveen knew him well "through working with him as an ex-police officer." Segoviano's counsel chose not to leave the subject in that posture. He asked Segoviano on direct examination when he went on the police force and when he terminated his employment. Segoviano testified, in response to further questions, that he "resigned" and took up employment at Republic Steel.

On cross-examination, government counsel asked "under what circumstances" he resigned, the court overruled a defense objection, and Segoviano answered, "I was accused of a stick-up of the McDonald's Drive-In." Judge Will then told the jury that this incident "has no relevance as to whether or not he did anything in this case", and the judge brought out that the charge against Segoviano was dismissed.

On redirect examination, counsel went into the subject again, and brought out that it was Hogeveen who asked Segoviano to resign, and that Hogeveen threatened him in two conversations.

On recross-examination, the subject was raised again, and Judge Will asked a number of questions which brought out the circumstances of the two conversations.

In the course of instructing the jury, Judge Will explained that the charge about McDonald's was not evidence at all about guilt or innocence in this case; that the government had been permitted to go into the circumstances under which Segoviano left the police department because the defense had first gone into it, and that it might have relevance, if the jury should so decide, as to Segoviano's credibility.

Doubtless the fact that Segoviano had been charged with a holdup and forced to resign as a police officer did not help his case, and government counsel made use of it by claiming, in arguing Segoviano's lack of credibility, that he had tried to create the impression that he had left the police department voluntarily. But we think that Segoviano and his counsel made the choices which resulted in these facts being brought out.

■ 2. *The claim that the court "castrated the defense."* Judge Will is said to have accomplished this horrendous mayhem by rulings and instructions which told the jury to disregard the defendants' version of the facts. As will be seen, there is no substance to the claim.

The first rulings complained of were made during cross-examination of Officer Alexander during the government's case in chief. He was asked about the arrest of John Mangano. Alexander said he had seen Mangano in the police station, while under arrest, but did not know where he was arrested. Judge Will sustained objections to further questions about Mangano's arrest. He ruled, correctly in the light of the record up to then, that Mangano's arrest was irrelevant. In a colloquy out of the hearing of the jury, it developed that Alexander's report indicated Mangano had been arrested in the parking lot east of the right of way by Officer Edelman. Judge Will suggested the defense call Edelman and said he would deal with the question if asked of someone who had knowledge.

Another officer, Robustelli, testified in the government's case in chief. Defense counsel, in an offer of proof, cross-examined him when the jury was not present.

Robustelli testified that Mangano was in a cell at the police station for half an hour, was then interrogated by an FBI agent, and then released. A James Castle was also brought in, along with various tools and welding equipment found in his car. After questioning, Castle was released. Judge Will denied the offer of proof, but suggested that the matter might be gone into as part of the defense if relevancy then appeared.

These rulings were correct.

Defendant Segoviano testified he parked his car in the parking lot, saw Mangano run south through the parking lot and into the street, and saw Alexander arrest Mangano just before Alexander arrested Segoviano. On rebuttal, the government called Mangano and Edelman. Both testified that Mangano drove into the parking lot, and Edelman arrested Mangano in his car. Mangano testified there was no other car parked there and Edelman testified that before he arrested Mangano he had seen Alexander arrest Segoviano on the railroad tracks. There was an obvious conflict between the circumstances of the Mangano arrest as told by Mangano and Edelman and as told by Segoviano. Counsel had his opportunity to cross-examine, although he makes some claim, which is difficult to follow, that he should have been allowed to cross-examine beyond the scope of the direct.

■ Defendants challenge the following portion of the court's instructions:

"I want you to understand that you are deciding only the cases of these two defendants, and whether you conclude that there were more people involved or not is immaterial to this case. You are only trying these two defendants. The fact that there may or may not be other people who were involved is irrelevant and immaterial. *Whether others were arrested or had something to do with the crime charged in the indictment has no bearing on the guilt or innocence of these defendants.* It is not to be considered by you as either showing that they are guilty or that they are innocent. You can conclude

that there were other people involved and these men weren't. You can conclude that other people were involved, but these men also were. You can conclude that no other people were involved, but these men were. This is for you to decide. *But the presence or absence of other people is immaterial to the determination of the guilt or innocence of these defendants. You are going to have to decide their cases on the evidence as it relates to them."* (Italics so supplied by defendants in their brief.)

Segoviano's counsel and government counsel, in argument, had both discussed the probability that more than two persons had been involved. The government was not required to produce all who may have participated, nor to prove that Mangano or Castle was innocent.

The only pertinent issue in the record about Mangano is whether he and Edelman on the one hand, or Segoviano, on the other, correctly related the circumstances of the Mangano and Segoviano arrests. (Alexander and Angell described the Segoviano arrest consistently with Edelman, and in conflict with Segoviano.) The jury could not have misunderstood the portion of the instructions just quoted as excluding that issue from their consideration.

■ *3. The assumption that a witness speaks the truth.* Judge Will, in instructing on credibility of witnesses and weight of testimony, adverted to an assumption or presumption, applying at the start of the jury's process of evaluation, that a witness speaks the truth, and to the various factors which may outweigh the assumption or presumption.

Adverse comment on this type of formula is found in United States v. Dichiarinte (7th Cir. 1967), 385 F.2d 333, 339. In the case at bar, both defendants gave testimony in conflict with that of government witnesses. Applying the instruction literally, each defendant was entitled to start with the benefit of the as-

sumption, the same as every other witness. Although we doubt that the instruction was helpful to the jury, we see no reason to conclude that it operated unfairly to defendants.

■ *4. Aiding and abetting.* Accepting the government testimony as to the activities of Knaack and Segoviano as true, there was adequate evidence, though circumstantial, that they actively participated in carrying out the plot to enter the bank and steal from it. Others may well have been involved, and either or both defendants may have remained outside the bank, aiding and abetting those who did enter.

Judge Will gave an appropriate instruction that either defendant be found guilty if the government proved beyond a reasonable doubt that he aided or abetted others who entered the bank.

Defendants make no real point here except that the instruction was inconsistent with a comment by the court to counsel earlier in the trial that there was no basis for a finding of aiding and abetting. Judge Will changed his view, however, and the instruction, rather than the comment, was correct.

■ *5. The Allen type charge.* The jury retired to deliberate at 12:50 p. m. on Thursday. At 10:30 p. m. after counsel stipulated the jury might separate, Judge Will gave supplementary instructions, including one which was generally of the so-called Allen type, and sent the jurors home. They resumed deliberations at 9:30 a. m. Friday and returned their verdicts at 11:30 a. m.

The instruction under attack did not contain all the elements of the supplementary instruction approved in Allen v. United States [2] nor of the *Allen* charge in the LaBuy manual.[3] It did include the following propositions, in substance: jurors are judges, not advocates; there is no reason to believe that twelve other jurors would be more qualified, competent, or likely to arrive at a unanimous verdict; jurors have a duty to open their

2. (1896), 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528, 530.

3. 33 F.R.D. 523, 611.

minds to the analyses of other jurors; in the last analysis a juror has the duty to arrive at the position he conscientiously believes right, and jurors may ultimately come to opposite conclusions; the jurors were urged that if they had become emotionally involved, they should start over the next morning calmly and dispassionately to examine the evidence and to listen to the analyses of each other with an open mind and see if they can not arrive at a unanimous conclusion.

The instruction contained no statement that the case must be retried, except as might be implied from the expression that the jurors had been selected "just as any other jury which would have to try this case over again, if you cannot arrive at an agreement, would be selected." [4]

We conclude that the charge did not advise nor coerce any juror to join in a verdict different from one which was conscientiously his own. We do observe that charges of this type often present a close question and district judges would be well advised to be most sparing and cautious in using them.[5]

Defendants also make objections to particular phrases in the instruction, but none of them could have misled the jury in the manner suggested.

■ 6. *Claim that Judge Will was an advocate for the prosecution.* Judge Will did question many, if not, most witnesses, called by both sides. He participated in that function to a substantially greater extent than is the practice of most presiding judges whose records we have read, and more than many lawyers would consider appropriate under the adversary system.

Defendants point to instances where an answer unfavorable to them was a reply to a question by the judge. In fact this did occur (as did the converse), but neither in those instances nor in the record as a whole do we find justification for the charge that he was or appeared to be an advocate for the prosecution.

Judge Will, in his charge to the jury, made reference to his practice of asking questions. He said,

"You know, because you heard me, that sometimes I ask questions of witnesses. Customarily I wait until both sides have said they have asked all the questions they want to, and then I have said I have a few questions I wanted to ask. I want you to understand that I don't ask questions because I think they are terribly important. I ask questions primarily because in the particular circumstances, I feel there are facts which have not been fully covered in the testimony which may be important. I never know what the answer is going to be. The questions that I ask are not intended to help the defense or intended to help the government. They are intended to help you. The purpose in asking them is that I think you may have the same questions that are in my mind, you can't ask questions, but I can, so I ask questions without knowing where the chips will fall with respect to the answers. I do so only because it seems to me that there are gaps which ought to be covered, but they may be with respect to relatively unimportant matters. Some of the questions I asked were with respect to unimportant matters. Some, I think you may find, were with respect to important matters. That is for you to decide.

"In any event, you are not, I want you to understand, you are not to attempt to draw any special significance from the fact that I asked a question. The questions might just as well have been asked by counsel. They weren't, and so I asked them. They have no more significance than if counsel had asked them, if the information had been adduced in the process of direct or cross examination."

Among the dangers of the practice of extensive questioning by the judge is the tendency that he may become embroiled

4. See United States v. White (7th Cir. 1967), 382 F.2d 445, 447.

5. See United States v. Bates, 407 F.2d 590, 7th Cir. Feb. 5, 1969, p. 11 slip opinion.

424

in the issues or in conflict with counsel to an extent that his objectivity is impaired. Another is that the jury may gain an impression, correct or not, that the judge has formed an opinion on an issue which is for the jury to decide.

We have read the record carefully, with these factors in mind. We are convinced that Judge Will's questioning did not cast him in the role, real or apparent, of prosecutor, and that the impression left upon the jury was within the limits of his explanation, quoted above. Although we would counsel restraint, because of the dangers involved in the practice, we do not find reversible error here.

The judgments are affirmed.