**UNITED STATES of America,**
**Appellee,**

v.

**Burl A. SAWYERS, Vincent J. Johnkoski,**
**Bonn Brown, Alfred W. Schroath,**
**Appellants.**

**No. 12872.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1969.

Decided March 23, 1970.

1336

Raymond W. Bergan, Washington, D. C., Stanley E. Preiser, Charleston, W. Va., and Henry Angel, Atlanta, Ga. (Edward Bennett Williams, Harold Ungar and Steven Brodsky, Washington, D. C., on the brief), for appellants.

Charles Ruff, Attorney, Department of Justice (Alfred N. King and Wallace H. Johnson, Attys., Department of Justice, and Milton J. Ferguson, U. S. Atty., on the brief), for appellee.

Before SOBELOFF, and CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

Six defendants, Burl A. Sawyers, Vincent J. Johnkoski, Alfred W. Schroath, Bonn Brown, Truman Gore, and William Wallace Barron, were indicted February 14, 1968, under 18 U.S.C.A. § 371 (1966).[1] The one count indictment charged conspiracy to commit bribery in violation of 18 U.S.C.A. § 1952 (1951) (Supp.1969).[2] A mistrial was granted

1. 18 U.S.C.A. § 371:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,-000 or imprisoned not more than five years, or both. * * *

2. 18 U.S.C.A. § 1952:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
 * * * * *
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to

to defendant Gore when his attorney became ill during trial. Former Governor W. W. Barron was acquitted, and defendants Sawyers, Johnkoski, Schroath, and Brown were convicted. Defendants Brown and Schroath were each fined $10,000 and sentenced to four years imprisonment, while defendants Sawyers and Johnkoski were sentenced to two years each and fined $5,000 and $10,000, respectively. We affirm the convictions.

The indictment charged that Brown and Schroath represented to legitimate business firms that they could be of assistance in obtaining business from the State of West Virginia and would procure state government contracts if paid to do so. Numerous selling firms employed Brown and Schroath and paid substantial sums of money into several corporations established and controlled by Brown and Schroath to receive these payments. It was part of the conspiracy that the Brown and Schroath corporations receiving payments for obtaining state business were to be taken over later by another corporation, which all six defendants would own equally. In this way, the indictment charged that state officials were bribed to grant or cause to be granted favorable contracts to business firms paying for them through Brown and Schroath.

On appeal, ingenious and diligent counsel have taken a shotgun approach to the validity of the trial, asserting that reversible error occurred in 13 respects. So many points of error suggest that none are valid. Even so, we have carefully considered the points assigned, to the extent of preparing a rough draft discussion of each, but upon reflection we think that most of the points do not merit doubling the length of the final opinion to include them. The two points of most interest relate to the so-called "Allen" charge and the asserted question of pretrial publicity.

## I. THE ALLEN CHARGE.

Defendants complain about the giving of a "dynamite" or "Allen" charge [3] to the jury after that body indicated it was deadlocked. The jury had deliberated for about 15 hours when its foreman sent the following note to the court:

> We have a juror that stated: "the judge will get all over those that vote not guilty."
>
> This juror has cursed, made slanderous remarks along with another juror throwing chewings [sic] gum. These two jurors are sister-in-law [sic] and want to go home.
>
> The vote is 10 guilty & 2 not guilty. It is a solid-vote and no one will give.

When the court reconvened after lunch, the jury was brought into the courtroom and given the supplemental charge.[4]

---

perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States. * * *

3. The name is derived from Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528.

4. The charge given by the court reads:

THE COURT: Mr. Foreman, and members of the jury, the court has received the information that you sent me from the standpoint of your having been, right before the lunch hour, at that time unable to reach a verdict.

I have asked you to come back in here to talk with you a little further. You have been in your jury room in the process of deliberating for approximately overall, sixteen hours. In view of the time consumed, and the evidence, and particularly documentary evidence, that is not unusual.

However, I wish to make a few suggestions, which you may desire to consider in your deliberations, along with

all the evidence and all the instructions previously given.

This, as you well realize, is an important case. The trial has been expensive to both the prosecution and the defense. If you should fail to agree on a verdict, the case is left open and undecided. Like all cases, it must be disposed of sometime. There appears no reason to believe that another trial would not be equally expensive to both sides. Nor does there appear any reason to believe that the case can be tried again better or more exhaustively than it has been, on either side. Any further jury must be selected in the same manner and from the same source as you have been chosen. So there appears no reason to believe that the case would ever be submitted to twelve men and women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence could be produced on behalf of either side.

Of course these matters suggest themselves upon brief reflection to all of us who have sat through this trial. The only reason they are mentioned is because some of them may have escaped your attention, which must have been fully occupied up to this time in reviewing the evidence. They are matters which, along with others and perhaps more obvious ones, remind us how important and desirable it is that you unanimously agree upon a verdict of "Guilty" or "Not Guilty", if you can do so without violence to your own individual judgment and conscience.

It is unnecessary to add that the Court does not wish any juror to surrender his or her conscientious convictions. As stated in the instructions given at the time the case was submitted to you, do not surrender your honest convictions as to the weight or effect or evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

However, it is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with your fellow jurors. And in the course of your deliberations, you should not hesitate to change your opinion when convinced it is erroneous.

In order to bring twelve minds to an unanimous result, you must examine the questions submitted to you with candor and frankness, and with proper deference to and regard for the opinions of each other. That is to say, in conferring together, each of you should pay due attention and respect to the views of the others, and listen to each other's arguments with a disposition to re-examine your own views.

If much the greater number of you are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors, who bear the same responsibility, serve under the sanction of the same oath, and have heard the same evidence with, we may assume, the same attention and a equal desire to arrive at the truth. On the other hand, if a majority or even a lesser number of you are for acquittal, other jurors ought to seriously ask themselves again whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellow jurors, and whether they should not distrust the weight or sufficiency of evidence which fails to convince the minds of several of their fellows to a moral certainty and beyond a reasonable doubt.

You are not partisans. You've got no friends to reward; no enemies to punish. You are judges—judges of the facts. Your sole purpose is to ascertain the truth from the evidence before you. You are the sole and exclusive judges of the credibility of all the witnesses and the weight and effect of all the evidence. In the performance of this high duty, you are at liberty to disregard all comments of both court and counsel, including of course the remarks I am now making to you.

Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of evidence. But remember also that, after full deliberation and consideration of all the evidence, it is your duty to agree upon a verdict, if you can do so without violating your individual judgment and your individual conscience.

You may conduct your deliberations as you choose, but I suggest, however, that when you retire you carefully re-examine and reconsider all the evidence bearing upon the questions before you.

Under these instructions, since there are multiple defendants charged in this indictment, you may find one or more of the accused guilty or not guilty as charged in the indictment. And at any

Defendants contend that this charge was erroneous in several respects: (1) in order to counterbalance the pressure to choose between guilty and not guilty verdicts, a reminder of the burden of proof should have been included in the charge; (2) because the defense rested at the end of the prosecution's case, language in the supplemental charge stating that no better, or more exhaustive, evidence could be produced by either side on a retrial should have been eliminated; (3) because the charge was given in response to the jury note, it confirmed the jury's belief that the judge would "get all over those that vote not guilty;" and (4) language in the charge indicating that the jury might be leisurely was coercive in view of the approaching Labor Day weekend. For these reasons, the defendants urge that the supplemental charge was sufficiently coercive to require a new trial.

To bolster their position defendants point to a second inquiry made by the jury about 15 minutes after the supplemental charge had been given and the jury had retired. The second note sent by the jury read:

> If two or more defendants are found *guilty* and the remaining defendants are declared *not guilty*, are all defendants considered *guilty*?

> In your last additional charge, you so indicated that each defendant should be voted on separately (as the verdict sheet and reads [sic]). However, during the trial the impression was conceived that if one was guilty —all were guilty.

After receiving this note the judge informed the jury that it was permissible to find one or more defendants not guilty and two or more guilty, provided that unless two defendants, at least, were found guilty, all had to be acquitted. Record at 1999–2001. Thereafter the jury retired and deliberated about one and a half hours before returning a verdict acquitting former Governor Barron and convicting Sawyers, Johnkoski, Brown, and Schroath.

We think these supplemental charges, under the circumstances of the complexity of the trial and its duration of some two weeks, were not so coercive as to impair the integrity of the verdicts. Previously the trial judge had properly and clearly placed the burden of proof. We think it was not error that he failed to repeat it in his supplemental instructions. Moreover, he was not asked to do so. Under the correct formulation of that burden jurors may arrive at a verdict of not guilty either because they find the facts to be consistent with innocence *or* because they are unable to determine the facts after conscientious effort. Since the prosecution may obtain a verdict of guilty only if the jury is convinced of the facts alleged beyond a reasonable doubt, whereas the defendant has the double opportunity of findings consistent with innocence or an inability to determine what the truth is, we think some reasonable degree of encouragement to arrive at a verdict is not inherently unfair to defendants.

Because the defendants rested their case without offering evidence, they complain of language in the supplemental charge to the effect that there was no "reason to believe that the case can be tried again better or more ex-

time during your deliberations you may return into court your verdict of guilty or not guilty with respect to any defendant charged and on trial, as to whom you have unanimously agreed upon a verdict as to any of the defendants charged or on trial in this indictment.

You may be as leisurely in your deliberations as the occasion requires; and you shall take all the time which you may feel is necessary. The marshals have been instructed, and are now instructed, to take you to your hotel whenever you are ready to go.

You may now retire, Mr. Foreman, and members of the jury, and continue your deliberations in such manner as shall be determined by your good and conscientious judgment as reasonable men and women.

haustively than it has been, on either side." We perceive nothing unfair in such a comment. Defendants were well represented by competent counsel. Nothing in the record suggests that the trial judge should have assumed that in the event of a retrial the defendants would change their tactics and choose to offer evidence.

The defendants' other two points of error with respect to the Allen charge are simply different formulations of their contention that such a charge is coercive and should be outlawed in this circuit. An examination of the dynamite charge used by the trial judge in this case shows that the court twice included language emphasizing that no juror should surrender his or her conscientious convictions because of the opinions of other jurors or for the mere purpose of returning a verdict. Indeed, to properly balance his instruction, the trial judge charged:

> [I]f a majority or even a lesser number of you are for acquittal, other jurors ought to seriously ask themselves again whether they do not have reason to doubt the correctness of a judgment which is not concurred in by many of their fellow jurors, and whether they should not distrust the weight or sufficiency of evidence which fails to convince the minds of several of their fellows to a moral certainty and beyond a reasonable doubt.

There was not the slightest intimation of impatience with the minority, nor any words that could be construed as a threat or even an expression of displeasure. It is not suggested to us that the judge's tone of voice and facial expression (aspects that cannot appear in the record) were other than calm and dispassionate. That he knew of the division may be significant in judging his motivation, especially where he makes inquiry, Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), but not of significance, we think, with respect to potential impact of his supplemental instructions on mi-

nority jurors. *They* always know their minority status, and if fearfully inclined, may presumably suspect a disgruntled judge can find them out.

■ It is impossible to measure precisely in time units how long a given jury may reasonably be required to deliberate. To require continued deliberation after some 15 hours does not seem to us unreasonable or coercive for a case of this complexity and duration. The documentary evidence alone that was offered to the jury fills three boxes stacked to a height of approximately four feet. The testimony and introduction of the documentary evidence consumed some 12 trial days. Under such circumstances as these, a quick acquiescence to an indication of difficulty in arriving at a verdict would have, we think, been contrary to the district judge's duty to exert every reasonable effort to keep the criminal dockets current.

We are aware that in recent years there has been increasing criticism of Allen type charges. Thaggard v. United States, 354 F.2d 735 (5th Cir. 1966); Green v. United States, 309 F.2d 852, 854 (5th Cir. 1962); Andrews v. United States, 309 F.2d 127, 129 (5th Cir. 1962) (Wisdom dissenting); Huffman v. United States, 297 F.2d 754 (5th Cir. 1962) (Brown dissenting). What fuels the criticism seems to be a composite of two ideas:

> (1) That since the trial judge cannot coerce a verdict, Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), he may not persuade or induce further deliberation once the jury has retired; and

> (2) That from some source there is derived the right to a hung jury, which right is a bulwark of liberty. See Huffman v. United States, 297 F. 2d 754, 755 (5th Cir. 1962) (Brown concurring and dissenting); Comment, on Instructing Deadlocked Juries, 78 Yale L.J. 100 (1968).

■ We reject both conceptions. The right to a hung jury, we think, is embraced within the larger right to a ver-

dict of acquittal when the jury is simply unable to ascertain the facts upon which guilt must depend. This "second chance" of acquittal, as distinguished from a determination of innocence, is bound up in our burden of proof and is similar to the Scotch verdict "not proven." It is true, of course, that hung juries have sometimes shored up liberty and it will doubtless occur again, but to assert that anyone has the right to hang a jury rather than the right to a true verdict is erroneous.

■ The so-called "right" to a hung jury is at most no greater than the right to an irrational verdict. See United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969); compare United States v. Davis, 413 F.2d 148 (4th Cir. 1969). With respect to either "right," it is clear that a defendant may not insist upon a jury instruction advising jurors they may irrationally acquit and that any one of them may deliberately hang the jury. Yet the power of jurors to do both is beyond question.

■ A defendant has no "right" to either an irrational verdict or a hung jury. He has only the right to have the jury speak without being coerced. The very premise of our system is that juries are empaneled to ascertain the truth, which is the meaning of "verdict."

When a defendant occasionally benefits, if he does, from a hung jury, he is getting not what he is entitled to have but something less. Beneath the criticism of verdict inducing instructions is the apparent assumption that such an instruction is always detrimental to defendants. We are unaware of any statistical survey proving or disproving such an assumption. We do know, however, that not infrequently verdicts of acquittal follow Allen type instructions.[5] So far as we know, there is no reason to suppose that an Allen type instruction is more likely to induce a verdict of guilty than of not guilty.[6] Indeed, the trial judge may not inquire as to how the jury stands, Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), and thus may not knowingly press for a verdict either way except in the rare instance when the jurors disclose to him, without inquiry, their division. *E.g.*, Bowen v. United States, 153 F.2d 747, 751 (8th Cir. 1946).

■ A calmly dispassionate balanced effort on the part of a trial judge

---

5. In this case former Governor Barron was acquitted. Without the Allen charge he might well have suffered the ordeal of a second trial.

6. An examination of the case law reveals the uncertainty and divergence of opinion about the effects of the Allen charge that exist in any given fact situation. *See, e. g.*, Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926) (Giving Allen charge after inquiry by court as to extent of jury's division was coercive); Thaggard v. United States, 354 F.2d 735, 739 n. 2 (5th Cir. 1965) (Allen charge given after a one day deliberation, but without any indication of deadlock, or request for further instructions, by jury, upheld); Green v. United States, 309 F.2d 852, 855 (5th Cir. 1962) (Charge stating it is minority's duty to listen to arguments of the majority with distrust of their own judgment, since majority will have better judgment than the mere minority, exceeded permissible limits); Andrews v. United States, 309 F.2d 127 (5th Cir. 1962)

(Charge that followed original charge in Allen v. United States closely was given after one hour and five minutes deliberation with no exception taken, upheld); Huffman v. United States, 297 F.2d 754 (5th Cir. 1962) (Charge given after five hours of deliberation and excepted to, charging, *inter alia*, if the jury followed the principles of law given by the court and recalled the evidence they ought to be able to agree on a verdict; held reversed); United States v. Rogers, 289 F.2d 433, 434 (4th Cir. 1961) (Charge omitting language that no juror should abandon conscientious convictions, reversed); Anderson v. United States, 262 F.2d 764, 773 (8th Cir. 1959) (Giving Allen charge after inquiring, not about specific numerical division, but whether jury was "at all evenly divided" and receiving positive response held not coercive, since there was no minority to coerce!); Bowen v. United States, 153 F.2d 747, 751 (8th Cir. 1946) (Allen charge given after foreman sent note that jury was divided 11 to one; held, no error).

to induce a verdict does not seem to us to invade the province of the jury. What, after all, is the purpose of the judge's initial charge to the jury? Is it not to induce a verdict based upon the evidence and the law as he has given it to them? Why is the trial judge in the federal system given the power to comment on the evidence, and to place the burden of proof, and to advise the jury that it is their duty to accept the law as he gives it to them, unless it is to help the jury arrive at a true verdict? If the jurors misunderstand the instructions, no one, we think, would seriously suggest that the judge may not subsequently clarify or repeat them. If, at the same time, he urges further deliberation in an effort to agree upon a verdict, and in doing so his comments are balanced and not slanted toward conviction, we are unable to perceive harm to the defendant.

 We confess that we would like the Allen type charge given here better if it did not mirror so exactly the language of the original Allen charge.[7] It would be better balanced, and fairer, if mention had been made of the duty of the majority to listen and consider any minority viewpoint, for we concede that being in the majority does not necessarily make one right. In United States v. Rogers, 289 F.2d 433 (4th Cir. 1961), Chief Judge Haynsworth, writing for the court and reversing a conviction because of an Allen type charge omitting reference to a juror's duty not to yield

---

7. The American Bar Association Project on Minimum Standards for Criminal Justice has expressly disapproved giving the Allen charge to a deadlocked jury, but has recommended a charge to be given before the jury retires to deliberate, to be repeated if necessary upon a deadlock. A.B.A. PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, TRIAL BY JURY § 5.4 (Approved Draft, 1968). Furthermore, the Committee on the Operation of the Jury System of the Judicial Conference of the United States Courts has recommended that the Allen charge no longer be given as a matter of judicial policy. The Judicial Conference recommended that the charge approved by the A.B.A. Project be given, with one addition, instead of the Allen charge. SUPPLEMENT TO REPORT OF THE COMMITTEE ON THE OPERATION OF THE JURY SYSTEM, JUDICIAL CONFERENCE OF THE UNITED STATES 2 (1969). It is interesting to note that the Committee did not base its recommendation on constitutional problems with the Allen charge, but considered use of the charge a matter of "judicial policy." *Id.* at 3.

The version approved by the Judicial Conference reads:

5.4 Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(I) that in order to return a verdict, each juror must agree thereto;

(II) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(III) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(IV) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous;

(V) *that each juror who finds himself in the minority shall reconsider his views in the light of the opinions of the majority, and each juror who finds himself in the majority shall give equal consideration to the views of the minority.*

(VI) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals. (Emphasized paragraph is the one recommended for insertion by the Judicial Conference.) SUPPLEMENT TO REPORT OF THE COMMITTEE ON THE OPERATION OF THE JURY SYSTEM OF THE JUDICIAL CONFERENCE OF THE UNITED STATES 2 (1969).

his conscientious conviction, said that if "the charge approved in Allen [had] been given here, there would be no open question of its propriety." Whether or not the question has opened a bit, we adhere to the rule in this circuit that appropriate use of the pure Allen charge is not *per se* reversible error. Even so, we strongly recommend use of a modified version of *Allen* that includes that part of the recommendation of the Judicial Conference italicized in footnote 7.

 Despite all of the adverse criticism of Allen type charges, we think it significant that not a single one of the circuits has outlawed supplemental instructions to juries for the purpose of inducing further deliberation and agreement upon a verdict.[8] United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969), is typical. What appears to be withdrawn from the discretion of the district judges in the main body of that opinion is all but restored in final footnote 32. The only real change resulting is a direction to the district judges in the Third Circuit that they shall not give instructions, either in the main body of the charge or in the form of a supplement, that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his own. We agree that this improves the original Allen charge.

## II. PRETRIAL PUBLICITY

 The defendants also complain of the denial of their motion for a change of venue, alleging that intensive pretrial publicity made it impossible for them to receive a fair trial. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d

600 (1966). Here the district judge thought that the pretrial publicity did not warrant a change of venue, and after an examination of the clippings in the record we find ourself in agreement.

There are 176 clippings in the record; of these, 55 reported various proceedings that occurred in the trial, including the appointment of Judge Martin from South Carolina to hear the case, the granting of a continuance, and excerpts from the indictment. Of the rest, 113 clippings dealt with events in the local politics of West Virginia. The political scene in that state had been thrown into an upheaval by the charges leveled against the defendants. Many of the clippings did not concentrate directly on the appellants, however, but on the West Virginia gubernatorial race, which had been affected by the indictments. Four of the excerpts dealt with matters other than the case against the defendants and would have required intimate familiarity with the case and the defendants to have any bearing at all. Another four dealt with exculpatory statements given by the defendants themselves to the press. It is significant, we think, that only 8 of the 176 clippings mentioned the other defendants to the exclusion of former governor Barron. The great bulk of the publicity hit Barron far harder than the others,[9] yet Barron was the only defendant acquitted.

This was not Sheppard-type publicity. There were no editorials or slanted articles demanding conviction. Indeed, our careful examination of all publicity reveals little more than what any prospective juror would learn when the indictment was read, or the opening statements made. The information published here amounted to little more than publication of the charges contained in the indictments and denials by the defend-

8. The Fifth Circuit has recently reaffirmed a proper Allen charge. Sanders v. United States, 415 F.2d 621 (5th Cir. 1969).

9. Even the headlines concentrated on Barron. Exemplifying most of the headlines is the following: "BARRON, 5 OTHERS WILL SEEK SEPARATE TRIALS." Charleston Daily Mail, March 2, 1968. Like the example, most of the headlines emphasized Barron's name, and many used his name to the exclusion of the others.

ants of their guilt. So far as we know, it has never been suggested, either by the Supreme Court, the Reardon Committee, or the Committee on the Operation of the Jury System of the Judicial Conference of the United States, that accusations of crime are to be kept secret. Publicity per se is not necessarily prejudicial. Neither in the briefs nor in oral argument were counsel for the defendants able to point out to us any item of publicity containing information or conjecture that could not be shown at the trial and that might reasonably affect an otherwise impartial juror.

■ The defendants also complain, however, that the voir dire conducted by the district judge was inadequate. The court, among other questions, asked the prospective jurors: "Have you formed or expressed any opinion as to the guilt or innocence of any defendant?" If the answer was "no," the next question was: "Do you know of any reason that you could not give both the government and the defendants a fair and impartial trial, and a true and just verdict render [sic] according to the law and evidence in the case?" If the answer to the first question was "yes," the next question would be: "Now listen closely, would it require evidence to remove from your mind the opinion that you say that you have formed or expressed?" No juror who indicated that he had formed or expressed an opinion was seated.

The defendants object to the voir dire because the court refused to question prospective jurors about what they had read of the case and what they had heard on radio or television. We think the trial judge's refusal to conduct a general inquisition was correct. What we have said about the nature of pretrial publicity governs here. There were no specific headlines, news reports, or editorials brought to the attention of the trial judge as possible sources of prejudice. Had there been, it would, of course, have been his duty to inquire about their impact upon the veniremen, but absent specific Sheppard-type items of prejudicial publicity, there was no such duty. To have asked the entire panel whether any of them had heard anything prejudicial to defendants and, if so, to state the nature of it might well have caused a mistrial, for every trial lawyer is aware that general questioning of veniremen can elicit some startling replies. Absent a basis for conjecture that specific prejudicial items may have reached the venire, we agree with the district judge that it was wiser to phrase the voir dire questioning in general terms.[10]

Affirmed.

SOBELOFF, Circuit Judge (dissenting):

The principal question raised on this appeal concerns the propriety of the Allen-type charge[1] given by the judge to the jury. The decision does not turn solely upon a consideration of Allen charges in general. If that were the only issue it would present difficulty enough, as evidence by the growing disenchantment of some of our most respected judges with its use. Our case, however, is marked by a unique feature which made the supplemental instruction particularly unsuitable.

After approximately fifteen hours of deliberation the jury sent the trial judge a note which read:

"We have a juror that stated: 'the judge will get all over those that vote not guilty.'

10. *See* A.B.A. PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS FOR CRIMINAL JUSTICE, FAIR TRIAL AND FREE PRESS 130 (Approved Draft, 1968), which sets out certain standards for selecting juries in criminal cases where *questions* of prejudice are raised. The standards recommended do not conflict with the district judge's action here, since the standards are only applicable when some possibility of exposure to prejudicial material is present. Here no such possibility was present, because defendants never pointed to any prejudicial material.

1. For the text of the charge in the instant case see the majority opinion at note 4.

This juror has cursed, made slanderous remarks along with another juror throwing chewings gum. These two jurors are sister-in-law and want to go home.

> The vote is 10 guilty and 2 not guilty.
> It is a solid-vote and no one will give."

In response to this note the judge delivered his supplemental charge. Its appropriateness must be judged in relation to the note, which not only advised the judge how the jury stood numerically, but also conveyed to him a brief but enlightening picture of conditions in the jury room. The question presented for review is whether the supplemental charge, which did not so much as advert to the note, was a proper response under these circumstances.

### I

As a preliminary matter, it may be helpful to consider generally the respective roles of judge and jury, and the effect of the use of the Allen charge upon each.

It is accepted in our modern jurisprudence that jurors must be allowed to deliberate free from any outside influence. [T]he essential meaning of Constitutionally guaranteed trial by jury is that once the jury has retired to consider of its verdict it should not be subjected to so much as the appearance of any influence from any source for the purpose of producing a verdict. The jurors should be left to the unhampered expression of their own consciences, independently arrived at.[2]

The courts have zealously guarded jurors in their decisional function, so that truth may be determined upon their independent view of the evidence under the judge's instructions as to the law.

Of all who come in contact with the jury, the trial judge commands the greatest respect, and he is uniquely in a position to influence the jurors. As Chief Justice Fuller put it in Starr v. United States, 153 U.S. 614, 626, 14 S. Ct. 919, 923, 38 L.Ed. 841 (1893), "[i]t is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."

With notable exceptions [3] the Allen charge is still generally in vogue, at least in modified form. Yet it has been criticized increasingly in recent years, both by judges [4] and commentators.[5] It

---

2. Judge Coleman, concurring in Thaggard v. United States, 354 F.2d 735, 741 (5th Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966).

3. The Third Circuit has recently outlawed future use of the Allen charge. United States v. Fioravanti, 412 F.2d 407 (1969). The Seventh Circuit has advised that district judges should be "sparing and cautious" in using the Allen-type charges, United States v. Knaack, 409 F.2d 418 (7th Cir.), cert. denied, 396 U.S. 831, 90 S.Ct. 87, 24 L.Ed.2d 83, and has recommended use of the A.B.A. approved charge, note 6, *infra*, where one is necessary. United States v. Brown, 411 F.2d 930 (7th Cir. 1969). The Tenth Circuit has suggested that if an Allen charge is to be given, it must be given in the main charge. United States v. Wynn, 415 F.2d 135 (10th Cir. 1969). Arizona and Montana have ban-

ned the Allen charge entirely. State v. Thomas, 86 Ariz. 161, 342 P.2d 197 (1959); State v. Randall, 137 Mont. 543, 353 P.2d 1054 (1960).

4. United States v. Wynn, *supra*, note 3; United States v. Fioravanti, *supra*, note 3; United States v. Knaack, *supra*, note 3; Thaggard v. United States, 354 F.2d 735 (5th Cir. 1965) (Coleman, J., concurring), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); Jenkins v. United States, 117 U.S.App.D.C. 346, 330 F.2d 220 (1964) (Wright, J., dissenting), rev., 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); Walker v. United States, 342 F.2d 22 (5th Cir.) (Brown, J., dissenting in part), cert. denied, 382 U.S. 859, 86 S.Ct. 117, 15 L. Ed.2d 97 (1965); Andrews v. United States, 309 F.2d 127 (5th Cir. 1962) (Wisdom, J., dissenting), cert. denied, 372

---

5. See note 5 on page 1346.

has been described in our own circuit as "approach[ing] the limits to which the court should go in suggesting to jurors the desirability of agreement and avoidance of the necessity of a retrial before another jury." United States v. Rogers, 289 F.2d 433, 435 (4th Cir. 1961).

Over the span of nearly three-quarters of a century since the Supreme Court upheld the specific supplemental charge given in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), many able jurists have investigated procedures to deal with deadlocked juries. In fact, as noted in the majority opinion, the American Bar Association Project on Minimum Standards for Criminal Justice and the Committee on the Operation of the Jury System of the Judicial Conference of the United States Courts

have both recommended that the Allen charge no longer be given to deadlocked juries, and have recommended alternative supplemental instructions.[6] Better still, both reports express a preference for including this subject matter in the original charge to avoid over-emphasis. The majority opinion faithfully reports these recommendations, but is not deflected by them.

Likewise, the Third Circuit in the recent case of United States v. Fioravanti, 412 F.2d 407 (3rd Cir. 1969), has forbidden future use of the Allen charge and, where some form of supplementary instruction seems appropriate, has recommended use of the charge formulated in Mathes & Devitt, Federal Jury Practice and Instructions, § 79.01.[7]

U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970 (1963); Green v. United States, 309 F. 2d 852 (5th Cir. 1962); United States v. Smith, 303 F.2d 341 (4th Cir. 1962); Huffman v. United States, 297 F.2d 754 (5th Cir.), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962); State v. Thomas, *supra*, note 3; State v. Randall, *supra*, note 3.

5. *See, e. g.,* A.B.A. Project on Minimum Standards for Criminal Justice, Trial by Jury § 5.4 (Approved Draft, 1968); Supplement to Report of the Committee on the Operation of the Jury System, Judicial Conference of the United States 2 (1969); Clark, Progress of Project Effective Justice—A Report of the Joint Committee, 47 J.Am.Jud.Soc'y 88, 90 (1963); Comment, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 103 (1968); Comment, Deadlocked Juries and Dynamite: A Critical Look at the "Allen Charge," 31 U.Chi.L.Rev. 386 (1964); Note, Due Process, Judicial Economy and the Hung Jury: A Reexamination of the Allen Charge, 53 Va. L.Rev. 123 (1967).

6. The two organizations have recommended virtually identical instructions. The version approved by the Judicial Conference reads:

5.4 Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(I) that in order to return a verdict, each juror must agree thereto;

(II) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(III) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(IV) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous;

(V) that each juror who finds himself in the minority shall reconsider his views in the light of the opinions of the majority, and each juror who finds himself in the majority shall give equal consideration to the views of the minority.

(VI) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

Subparagraph (V) was not included in the American Bar Association recommended charge.

7. It is your duty, as jurors, to consult with one another, and to deliberate

The essentially coercive nature of the stress in the supplemental charge upon the importance of achieving a verdict is manifested by the various characterizations it has been given by its advocates and detractors alike. It is traditionally known as the "dynamite charge," and it has variously been referred to as "nitroglycerin," Huffman v. United States, 5 Cir., 297 F.2d 754, 759 (1962) (Brown, J., dissenting); the "third degree instruction," Leech v. People, 112 Colo. 120, 146 P.2d 346, 347 (1944); and the "shotgun instruction," State v. Nelson, 63 N.M. 428, 321 P.2d 202, 204 (1958). This eloquently attests its presumed effect. "Dynamite," it must not be forgotten, is dangerous and should be handled with care.

## II

In this case we are not called upon to determine the propriety of an Allen-type charge in any and all circumstances. Accepting *arguendo* the general proposition, as stated in the majority opinion, that in an appropriate situation a "calmly dispassionate balanced effort on the part of a trial judge to induce a verdict" does not invade the province of the jury, this general proposition cannot decide the present case.

Those jurisdictions which allow Allen type charges do so on the assumption that neither the language used [8] nor the circumstances under which they are given [9] makes them coercive. The Allen

with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but to do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

In the prevailing opinion the argument is advanced that by allowing the delivery of this instruction *Fioravanti* substantially returns to the district judges the discretion to deliver a charge which it had just purportedly outlawed. I do not so read that case. In appropriate circumstances the delivery of the recommended well-balanced instruction would not have the harsh consequences implicit in an Allen-type charge. This recommended charge clearly apprises the entire panel that it should reevaluate its position with a view to reaching a decision. It is in no way aimed at the minority and defuses the dynamite of supplemental Allen-type charges.

8. Courts have held that Allen-type charges are coercive: if the trial judge failed to state that it was also the majority's duty to listen to the minority, United States v. Pope, 415 F.2d 685 (8th Cir. 1969); United States v. Smith, 353 F.2d 166 (4th Cir. 1965); Mangan v. Broderick and Bascom Rope Company, 351 F.2d 24

(7th Cir. 1965), cert. denied, 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 846 (1966); Green v. United States, 309 F.2d 852 (5th Cir. 1962); United States v. Rogers, 289 F.2d 433 (4th Cir. 1961); or charged that the jury had to agree, Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); United States v. Harris, 391 F.2d 348 (6th Cir. 1968); or said that he would be lenient if the jury brought in a conviction, Demetree v. United States, 207 F. 2d 892 (5th Cir. 1953); or threatened to keep the jury deliberating for a specified or indefinite time unless agreement was reached, Mead v. City of Richland Center, 237 Wisc. 537, 297 N.W. 419 (1941).

9. Other circumstances which courts have considered in deciding whether an Allen-type charge was coercive are the length of time the jury deliberated after the charge was given, 53 Am.Jur., Trial § 952 and cases cited therein; whether or not counsel objected to the charge, Sanders v. United States, 415 F.2d 621 (5th Cir. 1969); Huffman v. United States, 297 F.2d 754 (5th Cir.), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962); Christy v. United States, 261 F.2d 357, 17 Alaska 107 (9th Cir. 1958), cert. denied, 360 U.S. 919, 79 S.Ct. 1438, 3 L.Ed.2d 1535, reh. denied, 361 U.S. 857, 80 S.Ct. 47, 4 L.Ed.2d 96 (1959); and whether the judge made inquiry as to the division of the jury, Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926); Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905); Cook v. Unit-

charge should never be regarded as a routine expedient. A judge, before resorting to it, must critically appraise the hazards of its use in the particular setting.

One situation especially fraught with danger exists after a judge has been informed how the jury is split. Much that judges tell juries may fall short of outright threat and still exert subtle pressure upon them. In recognition of this fact the Supreme Court, in Brasfield v. United States, 272 U.S. 448, 450, 47 S. Ct. 135, 136, 71 L.Ed. 345 (1926), held that the judge may not make inquiry as to the division of the jury. Mr. Justice (later Chief Justice) Stone noted that such an inquiry "can rarely be resorted to without bringing to bear in some degree, serious, although not measurable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded." [10]

The "improper influence" in Brasfield to which Justice Stone alluded was heightened when the trial judge gave an Allen charge after making inquiry as to the jury's division.[11] The judge's knowledge of the jury's division spotlighted the minority jurors. They were made aware that the judge knew of their dissenting position. Despite the superficial neutrality of the judge's words, the tendency of the charge was to make the minority feel that the judge's observations and exhortations were aimed particularly at them. The impression upon the minds of the minority was, in effect, that the judge considered their stance obstructive and was urging them to yield.

In the instant case the judge did not inquire how the jury vote stood. Through no fault of the judge, the foreman's unsolicited note revealed this information but, as I shall endeavor to show, this variation is not significant in determining the applicability of Brasfield.

Only rarely have courts considered the propriety of delivering an Allen charge after the status of the jury's balloting had been voluntarily divulged to the judge. Bowen v. United States, 153 F. 2d 747 (8th Cir. 1946), cert. denied, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611 cited by the majority, did hold that where the judge is apprised of the jury's balloting without his having made inquiry, there is no impropriety in giving the charge.[12] This would form an exception to the Brasfield rule. However, the implications of Brasfield would seem to apply equally whether the information was promoted by the judge's inquiry or was thrust upon him. The pressure on the minority jurors is the same in both instances.

Chief Justice Burger, speaking as a judge of the Court of Appeals for the District of Columbia Circuit, had occasion in Mullin v. United States, 123 U. S.App.D.C. 29, 356 F.2d 368 (1966), to

footnotes

ed States, 254 F.2d 871 (5th Cir. 1958); United States v. Samuel Dunkel & Co., 173 F.2d 506, appeal after remand, 184 F.2d 894 (2nd Cir. 1949), cert. denied, 340 U.S. 930, 71 S.Ct. 491, 95 L.Ed. 671 (1951).

In Rhodes v. United States, 282 F.2d 59 (4th Cir.), cert. denied, 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226 (1960), and Orthopedic Equipment Co. v. Eutsler, 276 F.2d 455 (4th Cir. 1960), which upheld Allen-type charges, there were no special circumstances such as those present in this case.

10. Also see, Burton v. United States, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905).

11. The Allen charge was not the subject of specific discussion in Brasfield; thus the significance of its presence in that case is difficult to measure. There is a difference of opinion over whether inquiry alone in Brasfield, without the charge, would have led to the same result. See generally, Comment, On Instructing Deadlocked Juries, 78 Yale L.J. 100, 105, n. 25, 131, 132 (1968).

12. Accord, Sanders v. United States, 415 F.2d 621 (5th Cir. 1969); United States v. Meyers, 410 F.2d 693 (2nd Cir. 1969); United States v. Rao, 394 F.2d 354 (2nd Cir. 1968).

review a trial in which the vote had been disclosed to the judge without his solicitation. He said,

> It would have been a precarious undertaking for the Judge to give a supplemental charge to consider each other's views when he was already advised that only 4 of 12 jurors voted for acquittal. He could reasonably assume that if he gave such charge knowing that only 4 jurors had to be persuaded to change their votes, defense counsel would protest vigorously on appeal that the only correct solution was to declare a mistrial * * *. 356 F.2d at 370.[13]

What is it, then, that makes it a "precarious undertaking" for a judge to give an Allen-type charge after he has been made aware how the vote stands? It is true that whenever a judge gives the supplemental charge he is aware that the jury has been unable to reach a verdict. That is why the charge is given. It is also true that whenever the judge resorts to the charge the jury realizes that he knows of their deadlock. For these reasons it has been suggested that, whether or not the judge has been told the lineup in the jury room, the supplemental instruction would have the same effect on the minds of the minority jurors. I respectfully disagree. When the judge does not know how the jurors have voted, and a properly balanced Allen charge is delivered, the jurors may readily accept it as addressed to the entire panel.

However, when the jurors know that the judge has been advised precisely how they are divided—in this case 10 to 2—the effect of an Allen charge is unavoidably to add the judge's influence to the side of the majority, and this is so regardless of whether the initiative for disclosure came from the judge or the jury. In this predicament minority jurors are likely to develop a sense of isolation and the impression that they are the special object of the judge's attention. This is so even if the instruction includes, as in the instant case, the bland boiler-plate language about the majority also considering the views of the minority. The formula generally used as "balancer" is insufficient here because it does not relieve dissenting jurors of the feeling that the judge is goading them to agree upon a verdict.

### III

Aside from the undesirable effects flowing from disclosure of the precise division in the jury room there was in this case, in addition, a seriously aggravating circumstance. The message about the judge "get[ting] all over those that vote not guilty" imperatively called for a clear reassurance to the minority.

The statement should have signaled the judge that without an instruction explicitly counteracting it, a minority juror would consider the judge's silence a tacit confirmation of the threat. It was incumbent upon the judge to restore the panel's confidence in his neutrality which had been questioned in the jury room with sufficient force to prompt its mention in the note.

When the judge gave the additional charge "to induce a verdict" with no attempt to disabuse the jurors' minds, the effect may well have been decisive. The compounding error was in not tailoring the charge to the existing circumstances. Judges who find Allen charges otherwise appropriate might well hesitate to uphold it here.

In the absence of language to offset the utterance in the jury room, it is reasonable to infer that at least some of the jurors perceived the situation as follows: (1) the judge has been told the precise division and he knows about the statement made in the jury room that a verdict of not guilty would incur his displeasure; yet (2) he has said nothing in reply to assure us of his neutrality; but instead (3) he has stressed the importance of reaching a verdict; therefore,

---

13. *Accord,* Williams v. United States, 119 U.S.App.D.C. 190, 338 F.2d 530 (1964).

(4) to avoid the judge's disfavor, I will vote guilty.[14] Not only jurors inclined to acquit were likely to be affected, but those inclined to convict perhaps were stiffened in their resolve.

Like the other members of this court I have the highest regard for the ability and the fairness of the judge who presided at the trial, and reject the notion that he sought in any way to coerce the jury. However, it is plain that one or more of the jury entertained a doubt about the judge's attitude. This should not have gone unnoticed in the supplemental charge.[15] The judge's answer to the jury's communication was a lecture on the importance of attaining agreement and a verdict. This is only one side of the coin. Not a word was spoken to disavow the attitude attributed to him. The majority opinion does not come to grips with this significant aspect of the case, which colors the use of the Allen charge.

The prevailing opinion finds support in the fact that very shortly after the supplemental charge the jury returned its verdict of acquittal as to Governor Barron. It implies that the charge may well have been helpful rather than harmful to the defense. The logic of this reasoning is less than compelling, for it is as likely that the jury's deadlock was never in respect to the Governor but the appellants. If so, the supplemental charge may well have impelled them to convict. If there is a reasonable possibility that those who doubted the guilt of any defendant were pushed by the supplemental charge into joining the majority, the fairness of the trial was impaired.

When the incriminating evidence seems cogent to the judges, there is a temptation to condone trial errors. In a jury trial, however, the jurors are the ones to be convinced and no constraint upon their independent judgment can be condoned as harmless. "[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." Bollenbach v. United States, 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (Frankfurter, J.).

For these reasons I would reverse the appellants' convictions and award them a new trial.

14. Justice Udall, in his dissenting opinion in State v. Voeckell, 69 Ariz. 145, 210 P.2d 972, 980 (1949), established a similar syllogism:

The majority think that he is guilty; the Court thinks I ought to agree with the majority so the Court must think he is guilty. While the Court did tell me not to surrender my conscientious convictions, he told me to doubt *seriously* the correctness of my own judgment. The Court was talking directly to me, since I am the one who is keeping everyone from going home. So I will just have to change my vote.

Justice Udall's dissent was later vindicated when Arizona outlawed the Allen charge. *See* State v. Thomas, *supra*, note 2.

15. In a somewhat different situation, Mr. Justice Frankfurter stated in Bollenbach v. United States, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946),

An experienced trial judge should have realized that such a long wrangle in the jury room as occurred in this case would leave the jury in a state of frayed nerves and fatigued attention, with the desire to go home and escape overnight detention, particularly in view of a plain hint from the judge that a verdict ought to be forthcoming.

In the instant case the judge knew that two jurors expressed a desire to go home but nevertheless instructed the jury that they "may be as leisurely in [their] deliberations as the occasion requires; and you shall take all the time which you feel is necessary." The jury had been sequestered for 18 days and 17 nights. It began its deliberations the Friday before Labor Day weekend and the supplemental charge was given fifteen hours later. This could only have added to the pressure on the two minority voters.