

Widener, Circuit Judge, concurred and filed opinion.

Harrison L. Winter, Chief Judge, concurred in part, dissented in part, and filed opinion in which Donald Russell, Sprouse and Ervin, Circuit Judges, joined.

**UNITED STATES of America, Appellee,**

v.

**James Michael MARTIN, Appellant.**

**No. 82–5159.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1984.
Decided March 5, 1985.

H. Fred Kuhn, Jr., Beaufort, S.C. (Joel D. Bailey, Moss, Bailey & Dore, P.A., Beaufort, S.C., on brief), for appellant.

Karen I. Skrivseth, Dept. of Justice, Washington, D.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN, CHAPMAN, WILKINSON, and SNEEDEN, Circuit Judges and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge.

Following a jury trial the appellant was convicted of conspiracy to import hashish, conspiracy to possess hashish with intent to distribute, importation of hashish and possession of hashish with intent to distribute. He appeals claiming that the trial court erred (a) in giving "an unbalanced Allen[1] charge", (b) in admitting into evidence a boat registration card found in an automobile at the proposed off-load site, (c) in failing to grant a mistrial when a drug enforcement agent testified that he had found a ski mask during a search of the T-Craft boat, which search was conducted during the trial, and (d) in failing to instruct the jury to disregard certain remarks of the assistant United States attorney that allegedly placed a burden upon the defendant to prove his innocence. Upon en banc consideration, we find no merit in exceptions (b), (c) and (d), and we find that while the alleged unbalanced *Allen* charge was unnecessary, it was not coercive, so we affirm.

I

At about 2:30 a.m. on November 2, 1981, the sailing ship *Anonymous of Rorc* entered the North Edisto River in Charleston County after completing a crossing from Lebanon. It was loaded with 9600 pounds of hashish and had three crew members plus a captain. Shortly after entering the North Edisto River this ship was met by a white T-Craft fishing boat of about 20 feet in length. There was one individual in the fishing boat and he was wearing a ski mask. This individual boarded the sailing ship and took the helm, while the crew began loading the small boat with bales of hashish. At this time a customs patrol boat spotted the sailing ship and turned on its lights observing the *Anonymous of Rorc* and the T-Craft. The customs boat backed away a short distance, reported its find by radio, and prepared to board. At this time the crew began throwing bales of hashish over the side and the individual wearing the ski mask jumped into the T-Craft and headed up the North Edisto River.

The Coast Guard boarded the sailing ship and arrested the captain and the three crew members. From a chart found aboard the ship it was determined that the off-load site was West Bank Planatation. Officers were sent to this site where they seized a 1973 Plymouth automobile. The temporary registration card for the Evinrude motor of the T-Craft was found in the vehicle. About daybreak the T-Craft was found

---

1. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

grounded in Bohicket Creek. James Michael Martin was in the T-Craft and was arrested.

## II

Following three and a half days of trial the case went to the jury at 1:25 p.m. At 3:15 p.m. the jury asked to have certain testimony read by the court reporter and asked for an additional instruction as to constructive and actual possession. The charge was given. At 4:07 p.m. the jury returned requesting additional instructions and the reading of additional testimony. There was a delay in getting the court reporter to read the testimony. Two court reporters had been used in the trial due to a death in the family of one of the reporters.

By 9:35 p.m. the jury had returned from supper and at that time the court and the jury were waiting for the arrival of the first court reporter in order to read the requested testimony. While waiting, the judge inquired as to the quality of the meal and explained the cause of the delay. The court then stated:

He'll be here in just a minute and after you hear that testimony that you want to hear, we'll let you deliberate a while longer and see what happens tonight. I am not going to lock you up in there and forget about you. But I want to tell you something about it. As I said, you haven't got to give up a firm conviction just to go with the crowd, however, if you've got a firm conviction about the case one way or the other, that doesn't mean you shouldn't listen to reason and think with the others and reason with the others and see if those of you who, as I said, if you are in the minority on the Jury, listen to the views of the majority; and if you're on the majority on the Jury, you listen to the views of the minority. And don't get yourselves in a position where you turn your back and say do what you want, I'm through. You listen

and reason and I think you can arrive at a verdict after you hear his testimony. There is nothing wrong with not agreeing. Occasionally we have a Jury who doesn't arrive at a verdict. You're not the first Jury. I tell you in trying a case, a case is always tried by both sides best the first time it's always tried. The lawyers do a better job. The witnesses do a better job. When I say a better job, it's more likely that you will know the true facts of what happened. One of the reasons for that is that we had very little testimony that was transcribed that witnesses were questioned about. They had some testimony that one or two witnesses were questioned about their prior testimony; but when you have this and you don't reach a verdict or a jury doesn't reach a verdict, then it's tried again and the next time they'll have a transcript of this whole case. Every witness that gets back on the stand, you can't remember two or three months, how long it takes, you can't remember exactly what you said. You're not going to testify exactly as you testified before. You can't possibly do that. I was guilty when I practiced law, I was as guilty as anybody else. You take that transcript and you have exactly what somebody said last time and as soon as he changes one word or if he says six or eight this time and he says four to six the next time or five or six next time, we'll get that book out. What did you say last time? And it throws so much confusion in a case. It really does. Because every witness who's faced with what he said before, of course, he's read it. Every witness has probably read what he said before. He's trying to remember what he said before and you really never get as good a picture of a case as you do the first time its tried. So I hope that you can go back and continue deliberations and then just as soon as we get Mr. Polk,[2] we had him here and I let him go to supper because I told him we would call him. So he's

2. Mr. Polk was the court reporter who was coming to read the testimony requested by the jury.

standing by the telephone. He'll be here in 15, 20 minutes at the outside, I think; but I'm glad you had a good supper. Y'all go back and as soon as we get you in the Jury Room, do what deliberations you want to do. As I said, listen to what everybody thinks and as soon as we get him here, I'll let you know. Thank you.

There was an exception by the defendant as to that part of the charge "with regard to impeaching a witness' testimony and so forth" because defense counsel had used a prior statement in cross-examining some of the government witnesses. The court recalled the jury and gave an explanation of his prior comments as follows:

I want to tell you one thing that I didn't want to create an improper inference from what I said about the use of the testimony to cross-examine the witnesses. Every good lawyer does that. If I made an incorrect inference, I did not mean to infer that it was improper in anyway to take a person's testimony that he relayed earlier under oath and cross-examine him with it at some later trial or hearing. If you don't do that, you're not worth a grain of salt. Every lawyer knows that. There is nothing wrong with that. I didn't mean to infer with that.

This additional charge certainly cleared up any misunderstanding that may have resulted from the court's earlier remarks about the use of prior testimony. Since there was no objection to the first part of the charge, the charge must have been plain error if the defendant is to prevail on this point. In *United States v. Smith*, 353 F.2d 166 (4th Cir.1965), we held that a charge to a deliberating jury can be so clearly coercive as to be plain error. However, the trial judge in *Smith* did not give a balanced charge and stated: "A juror should listen with deference to the arguments and with a distrust of his own judgment if he finds a large majority of the

jury taking a different view of the case from what he does himself." *Smith*, 353 F.2d at 167. The trial judge in *Smith* also singled out the only female juror as the possible cause of the jury's delay in reaching a verdict. He mentioned a jury that had been kept up for two days and one night and added: "Of course, we have some mighty good hotels here and mighty good motels and I'll give you a mighty good place to sleep under guard." *Id.* at 168.

■ The danger of the *Allen*-type charge is the possibility that the minority on the jury may be coerced into going along with the majority. A decision so arrived at is not the unanimous verdict of each juror, but simply the decision of a majority of the twelve. *United States v. Rogers*, 289 F.2d 433 (4th Cir.1961).

■ The language of the supplemental charge is simply not coercive of any juror. It treats the majority and the minority equally and advises each to listen to the views of the other. "It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself." *Allen v. United States*, 164 U.S. at 501–02, 17 S.Ct. at 157. Although it is not the charge approved in *United States v. Sawyers*[3], 423 F.2d 1335 (4th Cir.1970), it was not given to a deadlocked jury in an effort to coerce it into reaching a verdict. The jury was still in deliberations, and although it had been out approximately eight hours, its notes to the court asking questions and requesting the reading of testimony and additional charges indicated that it was continuing to deliberate the issues. The trial judge charged the majority to *listen* to the minority and the minority to *listen* to the majority. This instruction is not as

---

**3.** In *Sawyers* we strongly recommended the use of a modified *Allen* charge recommended by the Judicial Conference of the United States in 1969, particularly the language "that each juror who finds himself in the minority shall recon-

sider his views in the light of the opinions of the majority, and each juror who finds himself in the majority shall give equal consideration to the views of the minority." *Sawyers*, 423 F.2d 1335, 1342–1343.

strong as the "shall reconsider" requirement of *Sawyers*.

The jury reached a verdict at 11:40 p.m., some two hours after the above charge, so there is no evidence that the charge had the coercive effect that we criticized in the unbalanced charge in *Rogers, supra*.

Since there was no indication that the jury was experiencing difficulty in agreeing on a verdict, the charge was unnecessary. But since it was not coercive in any way, it was not error. The charge simply repeated a part of what the judge had instructed in his initial charge:

> When you go to the jury room to deliberate and you start discussing the case, if you find yourself in the minority on the jury, listen to the views of the majority. If you find yourself in the majority, you listen to the views of the minority. You listen together, you reason together, you think together and listen and I'm sure you can arrive at a unanimous verdict.

The judge's statement that cases are always tried by both sides best the first time may have been inaccurate, but it was not coercive. Anyone who has gone through the ordeal of a retrial where each attorney has a transcript of the first testimony of each witness and anyone who has listened to the constant bickering and attempts to impeach because of minor differences in language from the first trial to the second can sympathize with the judge's effort to point out some of the problems of a retrial. This language was not coercive.

The trial judge's last statement to the jury before it retired for its final deliberations, and after it had heard the court reporter read the requested testimony, indicated that the court was making no attempt to coerce the jury into a decision or even to hurry the jury along in its deliberative process. The court stated to the jury:

> I think I'll let you go tonight and come back in the morning, if that's a good time. You deliberate a little while longer tonight. You can do either one. You go to the jury room and decide.

Since the supplemental charge of the district judge was not given to a deadlocked jury and the language of the charge was not coercive as to any juror or group of jurors, it was not erroneous.

### III

■ The defendant contends that the trial judge abused his discretion in admitting into evidence an owner's registration card for the T-Craft in which the appellant was arrested. The appellant questions the authenticity of the document. Federal Rule of Evidence 901(a) states:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

The question is really not one of authenticity, because the registration card speaks for itself and is obviously the registration card covering the T-Craft. The question is one of inconsistent testimony of whether the card had initially been given by the seller to the purchaser or whether it had been mailed. There was no abuse of discretion in the admission of the card.

### IV

■ Appellant contends that the court should have declared a mistrial after DEA agent Stein testified on cross-examination that a ski mask had been found on the T-Craft in a search that was conducted on the night between the first and second days of trial. The day before Stein testified, customs officer Jefferson, who arrested Martin on the T-Craft, twice answered defense counsel's question that no ski mask was found on this boat. The following morning when Stein testified, he did not mention on direct examination any items that were seized from the T-Craft. However, on cross-examination defense counsel asked Stein the unnecessary question as to whether a ski mask was found on Martin's boat. To his surprise the agent stated that a ski mask had been found on the T-Craft "late last night." Additional questions

were asked on cross about the location of the ski mask and why it was not previously found. On redirect examination of this witness no questions were asked about the ski mask or its discovery. Following the luncheon recess appellant moved for a mistrial because of the statements made by agent Stein about the discovery of the ski mask. The court pointed out that this information came as a result of a question asked by defense counsel and that it was responsive to the question. However, the court instructed the jury to disregard all testimony about finding the ski mask. Before granting a mistrial, the court should always consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate. *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir.1979), *cert. denied* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

■ In the present case the information about the ski mask came out because of an unnecessary question. The defendant had already proved by the previous witness that a ski mask was not found on the T-Craft. The answer was responsive to the question, the curative instruction was sufficient and not objected to, and a mistrial was not required.

## V

■ There is no merit to the appellant's contention that the prosecutor's closing argument created a shift of the burden of proof to the defendant. Appellant's defense at trial was essentially that he was a commercial fisherman who recently purchased a new fishing boat with a partner, and that he was in the area in which he was arrested because he was crabbing rather than because he was involved in the offense. A defense witness testified that a commercial crabbing operation would need 50 to 100 crab pots while another testified that such an operation would need 20 to 3000 crab pots. The only evidence appellant produced that indicated he owned any crab pots was a defense witness who testified that appellant had purchased four or five crab pots from him. The comments of the prosecutor to the effect of "Where are the crab pots?" were in response not only to this evidence, but also to the closing argument of defense counsel which mentioned a crabbing operation.

AFFIRMED.

WIDENER, Circuit Judge, concurring.

I concur in the result and in all of the majority opinion except part II thereof, which is with respect to the *Allen* type charge.

While I agree with the reasoning of the dissent as to the correctness of the charge given, I note there was no objection made to the charge (the only objection being to a matter not connected with the principal object of the charge). For the reason that no objection was made I would not reverse but have voted to affirm.

WINTER, Chief Judge, with whom Judges RUSSELL, SPROUSE and ERVIN join, concurring in part and dissenting in part.

We see no merit in defendant's appeal except with regard to the district court's gratuitous, unbalanced *Allen* charge. As said in the panel dissenting opinion, we think that this charge was coercive and upset the fine balance of the approved *Allen* charge that we have prescribed for this circuit:

> When the jury was told that a case is *always* tried *best* the *first* time that it is tried, the lawyers and witnesses do a *better* job in a *first* trial, and it is more *likely* that the jurors will get the *true* facts in a *first* trial … the admonition not to give up a firm conviction was seriously undercut. The jurors were told, in effect, that, if the truth was ever to be known, they must agree on a verdict, whatever their individual convictions.

*United States v. Martin*, 740 F.2d 299, 304 (4 Cir.1984) (emphasis in original).

We would reverse and grant a new trial.