**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 03-4297**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DAVID M. HARRIS,

Defendant - Appellant.

———————

**No. 03-4298**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

DAVID M. HARRIS,

Defendant - Appellee.

———————

Appeals from the United States District Court for the District of
Maryland, at Baltimore.  Benson Everett Legg, Chief District Judge.
(CR-01-115-L)

———————

Argued:  October 27, 2006          Decided:  January 31, 2007

———————

Before WILLIAMS, MICHAEL, and KING, Circuit Judges.

Affirmed in part; vacated and remanded in part by unpublished per curiam opinion.

**ARGUED:** Kenneth Wendell Ravenell, SCHULMAN, TREEM, KAMINKOW, GILDEN & RAVENELL, P.A., Baltimore, Maryland, for Appellant/Cross-Appellee. Christopher John Romano, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee/Cross-Appellant. **ON BRIEF:** Thomas M. DiBiagio, United States Attorney, Jane M. Erisman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee/Cross-Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David M. Harris appeals his convictions and sentences for the following offenses: conspiracy to possess with the intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C.A. § 846 (West 1999); possession with the intent to distribute five hundred grams or more of cocaine, in violation of 21 U.S.C.A. § 841(a) (West 1999); possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.A. § 924(c) (West 2000); being a felon in possession of a firearm, in violation of 18 U.S.C.A. § 922(g)(1) (West 2000); and unlawfully possessing ammunition, in violation of § 922(g)(1). Harris argues that the district court erred in denying his motion to suppress evidence obtained from the search of his apartment and vehicle and in denying him a Franks hearing.[1] He raises additional challenges to a number of the district court's evidentiary rulings and to the imposition of an upward departure at sentencing for obstruction of justice. Also at issue in this appeal are Harris's

---

[1]In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court recognized a "presumption of validity with respect to the affidavit supporting [a] search warrant," id. at 171, and held that a hearing on a motion to test the sufficiency of the affidavit is required only if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and the offending information was essential to the probable cause determination, id. at 175-56.

3

motion to remand for resentencing in accordance with United States v. Booker, 543 U.S. 220 (2005), and the Government's cross appeal challenging one aspect of Harris's sentence--the extent of the upward departure for obstruction of justice. For the reasons that follow, we affirm Harris's convictions, but vacate his sentence and remand for resentencing in accordance with Booker.

I.

A.

It is undisputed that this prosecution arose after Harris and a companion, Tilisha Wright, were attacked upon returning home to Baltimore, Maryland from a trip to Houston, Texas. On January 28, 2001, Harris was shot in the side and Wright was abducted and later shot in the back and left for dead. She was taken to Baltimore's Shock Trauma hospital and released later that night.

Wright provided a taped interview with police after the attack. In the interview, she explained that she and Harris left the airport, stopped briefly at Harris's brother's house, and then stopped in front of Harris's apartment building. She stated that Harris had just gotten out of the Jeep and was standing next to it, when a man she knew as Niam "walked up to the car, to David [Harris], and asked David 'where's it at?' And David said, 'what?' And as soon as David said 'what,' Niam started shooting him." (J.A. at 96.) Niam then came around to Wright's side and told her

4

to get out of the Jeep.  She saw another man coming towards Harris's door, and another "going through David's Jeep."  (J.A. at 100-101.)

Wright told police that at that point, she was forced from the Jeep into another car, and Niam asked her, "Where was the stuff at?"  When she asked what "stuff" he meant, he responded, "Tilisha, don't play with me, tell me where it's at?"  (J.A. at 103.)  She stated that the other two men, Jamal and Cuddy, then "came to the car and they was asking - asking Niam where was the stuff at?  And so Cuddy . . . went back to the Jeep and was still going through it.  And then he came back to the car and he was carrying David's phone."  (J.A. at 103-04.)  The three men then took her to a vacant house, where they continued to question her about money and drugs.

### B.

Based on Wright's interview and information gathered at the scene, Detective Raynard Jones and co-affiant Kerry Snead prepared an affidavit to secure a warrant for the search of Harris's Apartment (719 N. Carrollton Street, Apt. C), Harris's Jeep, and the car into which Wright had been forced.  The affidavit stated that "[o]ne of the black males approached the victim David Harris and stated, 'where is the money and drugs?'"  (J.A. at 168.)  It provided that after being shot, Harris "ran into 719 N. Carrollton Street and the suspects pursued him, entering only into the

5

apartment building vestibule. The suspects then exited [the building] and returned to the victim's 1996 Jeep Cherokee and began to search the victim's vehicle." (J.A. at 168.) The affidavit also provided that the suspect took Wright to a vacant house and "threatened her by gunpoint to reveal where David Harris had his money and drugs." (J.A. at 169.) The affiants indicated that they believed the incident was a drug transaction and/or drug-related robbery and that in their experience, "people who commit the crime of narcotics distribution, store and keep narcotics, weapons, firearms, ammunition, bullets and related evidences use [sic] during narcotic violations at the place where they stay or vehicle they drive for storage and safekeeping." (J.A. at 170.)

After the search warrant issued, Baltimore police homicide detectives searched Harris's apartment and Jeep. In the apartment, they found packaging materials, a scale, strainers, spoons, a cutting agent, and items commonly used to dilute and repackage controlled substances, as well as paperwork for co-conspirator Zenobia Penn and airline ticket stubs for Tilisha Wright. In the Jeep, they found one kilogram of cocaine hidden inside of Harris's luggage.

Harris was indicted on March 27, 2001. A Superceding Indictment, filed on May 16, 2001, and a Second Superceding Indictment, filed on October 24, 2001, followed. The Second Superceding Indictment charged Harris with five offenses:

6

conspiracy to possess with the intent to distribute five kilograms or more of cocaine (Count One); possession with the intent to distribute five hundred grams or more of cocaine (Count Two); possessing a firearm in furtherance of a drug trafficking crime (Count Seven); being a felon in possession of a firearm (Count Eight); and unlawfully possessing ammunition (Count Nine).

## C.

The case proceeded to trial. On September 26, 2001, Harris filed a Motion to Suppress any evidence seized from his residence and vehicle. The Motion to Suppress also contained a request for a Franks hearing. After a hearing, the district court denied the motion. Trial for Harris and co-conspirators Clarence Walker, Zenobia Penn, and Allah Burman began on June 6, 2002, but the district court granted a mistrial on June 12, 2002.

A new trial for Harris and Zenobia Penn began on October 15, 2002. The government called thirty-one witnesses during the seventeen-day trial. These witnesses included law enforcement officers, chemists, custodians of records for hotels and airlines, and a series of cooperating witnesses who played various roles in the drug trafficking conspiracy. Tilisha Wright testified at trial, as did Ramona Jones, the girlfriend of Allah Burman, one the leaders of the conspiracy. The pertinent witnesses for purposes of

7

this appeal are Officer Urica Jenerette, Detective Raynard Jones, Steven Jones, Ramona Jones, and Agent Matthew McCormack.

Officer Jenerette and Detective Raynard Jones testified regarding the investigation. During Officer Jenerette's testimony, Harris's counsel renewed the request that the court suppress the evidence obtained from the search of the apartment and Jeep and conduct a <u>Franks</u> hearing. Officer Jenerette testified that she found Harris on the steps of the apartment building after the shooting. She described him as bent over in pain and reluctant to speak with her or to give her his name, although he did not appear to her to be in shock. On cross-examination, Officer Jenerette indicated that she never asked Harris if he had entered his apartment, nor did he volunteer any information to that effect, but an officer on the scene had informed her that Harris had entered the vestibule area. She also confirmed that there was no blood trail or other physical evidence to indicate Harris's presence in or near the apartment after the shooting. Detective Jones, who helped prepare the affidavit, stated that Officer Jenerette never told him that Harris entered the apartment.

Cooperating witness Steven Jones testified that he had known Harris for twenty years. He described trips he had taken with Harris to carry money from Baltimore to Houston and stated that he had supplied Harris with cocaine two months before his first trip to Houston. Steven Jones testified regarding a letter that Harris

8

wrote to him and another letter that he had written to Harris. Harris objected to the introduction of portions of both letters during Steven Jones's testimony.

Ramona Jones testified that she met Harris in Houston while he was there to do drug business with her boyfriend, Allah Burman. She also testified that Burman told her that he had paid one of his suppliers for the cocaine that was lost when Harris was shot. Harris objected to this testimony on Fed. R. Evid. 801(d) grounds.[2] The district court questioned Ramona Jones outside the presence of the jury and determined that the two statements should not have been admitted against Harris. Harris's attorney requested a severance or mistrial. The court declined to grant a mistrial, and instead gave a curative instruction.

Agent Matthew McCormack offered information to the court regarding an incident that occurred at trial. He stated that while he was escorting Tilisha Wright to the witness room area, Harris waived at Wright and took a photograph of her.

---

[2]Fed. R. Evid. 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. It is clear from the context that Harris's counsel was asserting that Burman's statements to Ramona Jones were inadmissible hearsay because they were not made in the course of and in furtherance of the conspiracy.

On November 15, 2002, the jury reached a verdict, convicting Harris of all five counts with which he was charged. The jury found that the conspiracy distributed and/or possessed with intent to distribute five kilograms or more of cocaine.

The jury verdict form did not, however, specifically call for the jury to determine the amount of drugs attributable to Harris individually. Instead, the district court determined the quantity attributable to Harris at sentencing. After describing the determination as a "difficult" finding to make, the district court found that the quantity attributable to Harris was within the five to fifteen kilogram range, and calculated the base offense level for the conspiracy count accordingly. (J.A. at 1206-07.) The district court applied a two-level enhancement for Harris's role in the conspiracy offense and a one-level enhancement for obstruction of justice.

Harris was sentenced according to the then mandatory Sentencing Guidelines. The district court imposed a sentence of 210 months imprisonment for the conspiracy conviction (Count One), 97 months for possession with intent to distribute (Count Two), 60 months for possessing a firearm in furtherance of a drug trafficking crime (Count Seven), 41 months for being a felon in possession of a firearm (Count Eight), and 41 months for unlawfully possessing ammunition (Count Nine), with the sentences imposed on

Counts One, Two, Eight, and Nine to run concurrently among those Counts, but consecutive to the sixty-month sentence on Count Seven.

Harris timely noted an appeal to this Court. The Government cross appealed, challenging the district court's decision to impose only a one-level enhancement for obstruction of justice at sentencing, rather than the two levels called for by the Guidelines. On April 6, 2005, Harris filed a motion to remand the case for resentencing in accordance with United States v. Booker, 543 U.S. 220 (2005). At oral argument, this court questioned both counsel regarding the applicability of United States v. Collins, 415 F.3d 304 (4th Cir. 2005), to this appeal. Both parties subsequently submitted supplemental filings addressing the issue. We have jurisdiction to hear this appeal pursuant to 18 U.S.C.A. § 3742(a) (West 2000) (providing for appellate jurisdiction over a "final sentence" entered by the district court) and 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over "final decisions" of the district court).

II.

Harris raises numerous challenges to his convictions, arguing that the district court erred in (1) denying his motion to suppress the search of his residence and vehicle, (2) denying his request for a Franks hearing, (3)admitting certain statements of Clarence Walker and Niam King as statements of coconspirators made in

11

furtherance of the conspiracy and admitting "any evidence after [Harris] was expelled from the conspiracy," (Appellant's Br. at 29), (4) denying his motion for a mistrial due to certain testimony of Ramona Jones, (5) admitting a letter written by Harris to Steven Jones, (6) admitting a letter written by Steven Jones to Harris, and (7) admitting evidence that Harris took a photograph of Tilisha Wright, a government witness, and (8) granting an upward departure during sentencing for obstruction of justice. We address each of Harris's challenges to the evidence introduced at trial before turning to his motion to remand for resentencing in accordance with Booker, and then we turn to the issues raised regarding the one-level enhancement for obstruction of justice.

A.

We first address the admissibility of the evidence obtained from the search of Harris's apartment and vehicle. We review the legal conclusions involved in a district court's suppression determination de novo and factual findings underlying the legal conclusions for clear error. United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998). In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the Government. Id.

The Fourth Amendment's prohibition against unreasonable searches represents a fundamental right that "is preserved by a

12

requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004) (internal quotation marks omitted). Evidence obtained in violation of the Fourth Amendment may be subject to suppression under the exclusionary rule, meaning that it cannot be used in a criminal proceeding against the victim of the illegal search and seizure. United States v. Perez, 393 F.3d 457, 460 (4th Cir. 2004). Determining whether the exclusionary rule applies in this case involves a two-step inquiry. We consider (1) whether a substantial basis existed for a finding of probable cause to conduct the search, and (2) if probable cause did not exist, whether the court could nevertheless uphold the warrant under the "good faith" exception to the exclusionary rule established in United States v. Leon, 468 U.S. 897 (1984).

1.

We turn initially to the question of whether probable cause existed to search the apartment and the Jeep. Probable cause only requires "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." Id. at 238-39 (internal quotation marks and alteration omitted). To accomplish this task, we look to the affidavit underlying the warrant, which "must

13

provide the magistrate with a substantial basis for determining the existence of probable cause." Id. at 239. The Supreme Court has cautioned, however, "that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." Id. at 236. Affidavits are to be interpreted in a commonsense, not hypertechnical, manner, and "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." Id. (internal quotation marks omitted).

"In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 556 & n.6 (1978)). This court has adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988). In Anderson, the affidavit indicated that Anderson was trying to sell a particular gun that had been used in a murder, and we concluded that although no specific facts established a direct link between the gun and Anderson's residence, it was reasonable to believe that he was probably keeping the gun in his home. Id.

14

The Government argues that the search of Harris's apartment presents a similar situation. The affidavit indicates that the men who shot Harris were looking for money and drugs that they believed to be in his possession, but did not find them. The affiants did not suggest that being attacked by people demanding drugs and money, standing alone, establishes probable cause to believe that the victim was in fact a drug trafficker who actually had the drugs and money sought. Rather, the affiants stated that based on their experience and investigation of the scene, they believed that the shooting had all the earmarks of a drug robbery. They based this conclusion in part on their observation that the vehicle believed to be the assailants' getaway car had a hole in the radiator, suggesting that the victim had returned fire, and in part on Harris's previous convictions for controlled substances and handgun crimes.[3] The affidavit provided that, in the experience of the investigators, people who have drugs generally keep them in the place where they stay or the vehicle they drive.

Harris's primary contention, however, is that the affidavit provides no information indicating that Apt. C, 719 N. Carrollton St. ("the apartment") is the place where he stays. Our precedent suggests that such evidence is necessary to support a determination that probable cause exists to search that place. See Lalor, 996

_____

[3]The previous convictions would have made it unlawful for Harris to possess a firearm and ammunition.

15

F.2d at 1582 ("As for the evidence that Lalor resided at 1572 Waverly Way, no staleness problem exists. Information from one informant and police investigation indicated that Lalor lived at 1572 Waverly Way in December 1989 and January 1990. When stopped by a police officer on January 6, 1990, three weeks prior to the search, Lalor gave his address as 1572 Waverly Way. . . ."). Detective Jones testified at the motions hearing that he learned Harris lived in the apartment from interviewing Wright and a resident of the apartment building, Tanya Harris. He did not, however, indicate that he had presented this information to the magistrate.

"When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996). Because the information presented to the magistrate did not include a reference to the statements of the two women indicating that Harris lived in the apartment, it cannot supply a basis for a probable cause determination. Without this information, the magistrate could not have made an independent determination that Harris and his drug activity were connected to a particular second floor apartment, but would have had to infer from the affiants' desire to search the apartment that David Harris must live there.

16

The only other link the affiants provided between Harris and the apartment was the bare assertion that Harris possibly entered the apartment after he was shot. There was no basis supplied for that assertion, however -- no evidence, for example, of blood nearby, the door having been open, or witnesses having seen him enter Apartment C, or even go upstairs. Consequently, the statement provides no support for a finding of probable cause. See Wilhelm, 80 F.3d at 120 (concluding that a substantial basis for a finding of probable cause did not exist where a warrant was based on an informant's tip and "the magistrate judge found sufficient indicia of reliability in the affidavit by simply accepting the unsupported conclusions of the affidavit").

We therefore conclude that the affidavit fell short of establishing probable cause to search the apartment.[4] In reaching this conclusion, we bear in mind that "the right to 'sanctity of private dwellings' has been held to be the right 'ordinarily afforded the most stringent Fourth Amendment protection.'" Wilhelm, 80 F.3d at 121 (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976)).

---

[4]The district court summarized Harris's arguments that probable cause to search the apartment did not exist, but did not rule on the issue. The district court turned directly to Harris's second argument, that the good faith exception to the suppression of evidence obtained from a deficient warrant established by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984), did not apply.

17

Harris makes the same arguments with respect to the search of the Jeep. We disagree that the vehicle search was not supported by probable cause. The affidavit provided that an eyewitness to the shooting, Wright, told police that Harris had just exited the driver's seat of the Jeep when he was shot and that his assailants demanded drugs and money and then searched through the vehicle. The affidavit also indicated that the attacker's car had a bullet hole in its radiator, suggesting that Harris may have returned fire, and that Harris had previous convictions for drug and firearms offenses. These facts make it less likely that the attack resulted from a case of mistaken identity or represented a random shooting. In addition, returning fire would have required Harris's possession of a loaded gun, which would have been unlawful in light of his previous felony conviction. We conclude that the magistrate had a substantial basis for determining that probable cause existed to search the vehicle.

2.

The Supreme Court recognized a good faith exception to the suppression of evidence obtained from a deficient warrant in United States v. Leon, 468 U.S. at 924-25. "[U]nder Leon's good faith exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was objectively reasonable." Perez, 393 F.3d at 461 (internal quotation marks omitted). The exception

18

applies unless (1) the warrant is based on an affidavit containing "knowing or reckless falsity," (2) the magistrate failed to "perform his neutral and detached function" and merely served as a "rubber stamp" for the police, (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or (4) the warrant is so facially deficient that no reasonable officer would presume it to be valid. Leon, 468 U.S. at 914-15, 923. In those four circumstances, reliance on a warrant is objectively unreasonable.

Harris asserts that this is a case involving a "bare bones" affidavit, so lacking in indicia of probable cause that reliance on the warrant is unreasonable. The district court disagreed, finding that "[t]he police were operating under the reasonable belief that Mr. Harris lived in Apartment C and that drugs could possibly be found there." (J.A. at 1235.) We conclude that the district court properly denied the motion to suppress on the grounds that the evidence obtained in the search was covered by the Leon exception to the exclusionary rule. In this case, the investigating officers acted in good-faith reliance on the warrant.

In applying for the warrant to search 719 N. Carrollton, apartment C, in Baltimore, the officers submitted a six-page affidavit providing information that Harris was involved in drug trafficking, that he was the target of an attempted robbery on the street at 719 N. Carrollton, and that his assailants believed he

19

was carrying a large amount of drugs and cash. The officers also explained the probability that specific items of evidence connecting Harris to drug trafficking would be located in his residence. The affidavit connected Harris to the three-story apartment building at 719 N. Carrollton by discussing the attack on him in front of the building that began as he drove up in his car, his flight into the vestibule of the building during the incident, and the officers' observation of him sitting (with a severe gunshot wound) on the steps of the building shortly thereafter. All of this information connected contraband to Harris's residence and Harris to the building. The officers, however, overlooked the need to state (1) that Harris lived in the 719 N. Carrollton apartment listed in the affidavit and (2) their grounds for believing he lived there. See United States v. Procoppio, 88 F.3d 21, 28 (1st Cir. 1996) ("[I]t is easy to understand how both the officer applying for the warrant and the magistrate might overlook a lack of detail on a point often established by the telephone book."). The apartment to be searched is prominently identified in the affidavit, and it is easy to read the affidavit and not realize that the officers failed to connect the final dots specifically linking Harris to the apartment. Because the omission was inadvertent and not readily apparent, the officers could have had the objectively reasonable belief that their affidavit supplied probable cause.

Harris further contends that there could be no good faith reliance on the warrant because it contained false statements and material omissions. He points primarily to the statement that he "possibly entered the apartment," (J.A. at 170), after being shot. This statement does not assert that he did in fact enter the apartment, but merely raises the possibility that he did, making it difficult to characterize the statement as affirmatively false. Moreover, as discussed above, this bare assertion contributes nothing to the affidavit that would support a finding of probable cause. Consequently, it is immaterial to the magistrate's determination. Harris also argues that the affidavit should have noted that there was no blood trail to the apartment and that his keys were found in the street outside the building. He undisputedly managed to enter the vestibule of the building, however, without his keys and without trailing blood. While the fact that his keys were found in the street makes it less likely that he entered the apartment after he was shot, it does not make it impossible. More importantly, whether or not Harris entered the apartment on that day is not dispositive. The primary reason for searching the apartment was the belief that he was involved in drug trafficking prior to the day he was shot and that evidence of that involvement would be found in his home. Furthermore, Harris made no showing that any of the allegedly false statements or material omissions were knowingly or recklessly made. We therefore conclude

21

that the officers' reliance on the warrant was objectively reasonable, and, as a result, the evidence seized from Harris's apartment falls within <u>Leon</u>'s good faith exception to the exclusionary rule.

B.

Harris argues that the district court should have afforded him a <u>Franks</u> hearing. We review the district court's factual determinations for clear error and its legal conclusions de novo. <u>United States v.Najjar</u>, 300 F.3d 466, 475 (4th Cir. 2002).

Harris moved for a <u>Franks</u> hearing on the ground that false information was included in the affidavits supporting the search warrants. In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court recognized a "presumption of validity with respect to the affidavit supporting [a] search warrant," <u>id.</u> at 171, and held that a hearing on a motion to test the sufficiency of the affidavit is required only if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and the offending information was essential to the probable cause determination, <u>id.</u> at 155-56. <u>See also</u> <u>United States v. Colkley</u>, 899 F.2d 297, 299-300 (4th Cir. 1990) (same). The district court found that Harris "failed to show that these allegedly false statements and omissions were made knowingly

22

and intentionally" and denied the motion for that reason. (J.A. at 1238.) On appeal, Harris again asserts that the affidavit contained false statements and material omissions, but again offers no evidence that the allegedly false statements and omissions were made knowingly and intentionally or with reckless disregard for the truth. We therefore conclude that the district court did not err in denying Harris's motion for a <u>Franks</u> hearing.

## C.

Harris objects to the admission at trial of certain statements made by Clarence Walker and Niam King on the day that Harris was shot. Decisions regarding the admission or exclusion of evidence are committed to the sound discretion of the district court and will not be reversed absent an abuse of that discretion. <u>United States v. Bostian</u>, 59 F.3d 474, 480 (4th Cir. 1995).

The statements to which Harris objects were admitted against his co-defendant, Zenobia Penn, pursuant to Fed. R. Evid. 801(d)(2)(E), which provides for the admission of statements made by co-conspirators in furtherance of the conspiracy.[5] Before a

_____

[5] During a motions hearing, the district court suggested that "Harris [wa]s ejected from the conspiracy" on January 28, 2001, the date he was shot, after which point he was "no longer a member of the conspiracy." (J.A. at 209.) The court expressed concern about whether the attack on Harris properly could be described as in furtherance of the drug trafficking conspiracy, rather than solely in furtherance of the personal position of certain members. The court then determined that to the extent the events involved a

23

court can admit such statements over an objection that the statements do not qualify under the Rule, the court must be satisfied that the Government has shown, by a preponderance of the evidence, that the testimony does fall within the definition in Fed. R. Evid. 801(d)(2)(E). Bourjaily v. United States, 483 U.S. 171, 175 (1987). In this case, there was a great deal of evidence that a conspiracy existed, and the investigating officers described the shooting as having the characteristics of a calculated drug robbery. Harris had an alternative theory -- that he was shot because he had a sexual relationship with Tilisha Wright, which made her boyfriend, a leader in the drug trafficking conspiracy, jealous and angry. Although Harris elicited testimony from Wright that supports the (retribution-from-a-jealous-lover) theory, it does not change the fact that there existed much more evidence pointing to a drug robbery.

The district court gave a limiting instruction making clear that the challenged statements were not to be admitted against Harris. Harris, however, claims he was prejudiced despite the instruction. It is hard to see how the statements challenged -- he points primarily to the "where's it at" and "David is dead" remarks made to Wright -- were so prejudicial that they could not be overcome. We therefore conclude that the district court did not

_____

conspiracy of which Harris could not be considered a part, he would be entitled to a limiting instruction or a severance.

24

abuse its discretion in admitting the statements against Harris's co-defendant.  See United States v. Francisco, 35 F.3d 116, 119 (4th Cir. 1994) ("We generally follow the presumption that the jury obeyed the limiting instructions of the district court.").

D.

Harris contends that the district court erred in denying his motion for mistrial due to certain testimony of Ramona Jones. Ramona Jones testified that Harris went to Houston to do drug business with Allah Burman and that Burman paid one of his suppliers for the drugs that were lost when Harris was shot.  The district court agreed that the evidence should not have come in,

and gave a curative instruction,[6] rather than granting Harris's request for mistrial.  Harris argues this was insufficient.

"[D]enial of a defendant's motion for a mistrial is within the sound discretion of the district court and will be disturbed only under the most extraordinary of circumstances."  United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997).  District courts evaluate "whether there is a reasonable possibility that the jury's verdict was influenced by the material that improperly came before it" in deciding whether to grant a motion for mistrial.  United

---

[6]The district court outlined the evidence it was excluding and instructed the jury to disregard it.  In "deleting" the evidence from the record, the district court explained that,

> Now, what are you to make of these rulings, removing evidence from the record?  And the answer is nothing. You're not to draw any conclusions that I'm giving you any signal or giving you any instruction at all about Ms. Jones or her testimony or my evaluation of the evidence in the case.
> I told you at the outset that the judge is like a computer switch, like a gatekeeper.  All I do is decide whether the evidence comes in or is excluded and it's entirely up to you as the jury to determine what weight to give the evidence and what to make of the evidence. So I'm simply here to say you either look at it or you can't.
> Sometimes in a trial, because a trial happens like a live television show, it's not prerecorded for the jury, sometimes in a trial evidence will come in that, upon reflection, should not have come in in the first place and the only remedy for that is to instruct the jury to disregard that evidence.
> Again, I'm not making any evaluation of the evidence that was given that I'm now excluding.  I'm simply saying that under the rules that govern a trial, the rules of evidence, you should not have heard it in the first place and, therefore, exclude it.

(J.A. at 991-92.)

26

States v. Seeright, 978 F.2d 842, 849 (4th Cir. 1992) (internal quotation marks omitted). "Before granting a mistrial, the court should always consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate." United States v. Martin, 756 F.2d 323, 328 (4th Cir. 1985).

We conclude that this case does not present extraordinary circumstances that warrant reversing the district court's decision. The district court gave a curative instruction to the jury. Although Harris argues that other than testimony from Steven Jones, whom he describes as having "severe credibility problems," Ramona Jones's testimony was the most damaging, (Appellant's Br. at 34.), Ramona Jones, like Steven Jones, testified pursuant to a plea agreement. As a result, her credibility was subject to the same type of attacks levied against Steven Jones. Moreover, the evidence at trial was not limited to the testimony of cooperating witnesses. Law enforcement officers, chemists, and custodians of records for hotels and airlines also testified; non-testimonial evidence including airline records showing that Harris had paid for the return flights of other conspirators, a kilogram of cocaine seized from Harris's luggage, and a variety of drug paraphernalia seized from Harris's apartment was also introduced. Consequently, we conclude that the district court did not err in denying Harris's motion for a mistrial.

E.

Harris also challenges the admission of a letter that he wrote to cooperating witness Steven Jones and a letter that Steven Jones wrote to him in response. The district court's admission of evidence pursuant to Fed. R. Evid. 403 and Fed. R. Evid. 404(b) is reviewed under an abuse-of-discretion standard and will not be overturned unless it is arbitrary or irrational. United States v. Powers, 59 F.3d 1460, 1464 (4th Cir. 1995).

1.

Harris's letter to Steven Jones stated,

> And all that I can say to that is that you are a grown damn man just like I am and you know the life that you chose, just like I do. So just because things get a little uncomfortable and don't seem to go your way, don't mean you supposed to be letting these people put you in another trick bag by letting you be the fuel to this bullshit ass fire they got going on. Steve, I been knowing you a long time and you can never begin to understand the respect and admiration I have always had for you. So all I ask, don't turn your back on the people that you truly care about.

(J.A. at 721-22.)

The court allowed the letter to come in as evidence of consciousness of guilt, not as evidence of criminal propensity or bad character. The court gave the jury a careful limiting instruction regarding the letter.[7]

---

[7]The district court explained to the jury that "Harris denies that he attempted to influence or intimidate . . . Mr. Jones." (J.A. at 1059.) The district court then instructed the jury:
[Y]ou may not consider the evidence about these alleged

28

We have previously held that evidence of attempts to influence a witness is admissible if it is related to the offense charged and is reliable. United States v. Van Metre, 150 F.3d 339, 352 (4th Cir. 1998). The letter here is related to the offense charged, and is signed by Harris. The district court's limiting instruction ensured that the jury understood the purpose for which the letter was admitted and the amount of weight they were permitted to accord it. We therefore conclude that the decision to admit the letter was neither arbitrary nor irrational.

2.

Federal Rule of Evidence 106 provides that,

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106. Harris introduced portions of the letter written by Steven Jones to show that Jones was biased and hostile

---

. . . attempts to influence as a substitute for proof of guilt in this case. However, if you find that Mr. Harris did attempt to intimidate or influence a witness whom he believed the government was going to call or had called, you may, but are not required to, infer that the defendant believed he was guilty of the crime for which he is here charged.

Whether or not evidence of a defendant's intimidation of a witness shows that the defendant believed that he was guilty of the crime for which he is now charged and the significance, if any, to be given to such evidence is for you, the jury, to decide.

(J.A. at 1059.)

toward him. Steven Jones identified the letter and was questioned about portions of it, including the fact that he had signed the letter "Yours Truly, Self-Preservation." (J.A. at 768-71.) The district court found that as a result, the Government could introduce the rest of the letter to show that Jones had other reasons for his testimony.

Harris, however, argues that the remaining portions of the letter should not have been introduced because its probative value was outweighed by the danger of unfair prejudice. The district court, however, redacted certain portions it viewed as prejudicial. (J.A. at 823-24.) Harris claims the statement that, "We both don't need to take that rap," (J.A. at 830), is extremely prejudicial. He does not, however, contend that it was unfairly prejudicial. We conclude that the district court did not abuse its discretion in allowing the jury access to the context in which the questioned statements were made.

F.

During the Government's case in chief, Special Agent McCormack was prepared to testify that Harris took a picture of Wright during a recess in the trial. He stated that he had been in charge of escorting Wright to and from the courtroom. During a recess, Agent McCormack observed Harris gesturing at Wright. Several minutes later, Harris did a forty-five-degree turn towards her, took a few

30

steps, and took Wright's photograph with a camera.  Harris also took other pictures at the courthouse; there was a great deal of activity at the courthouse that day, because the Washington D.C. area sniper suspects were present as well.[8]  Agent McCormack explained that Harris also waived at Wright on another occasion, but none of the gestures that he saw were clearly threatening.  The district court found the evidence not sufficiently clear cut to be admissible under Rule 403, but indicated that it was a potential sentencing issue that the court would revisit if there was a conviction.

The district court did, however, indicate that it would allow evidence of the picture-taking to come in during any cross-examination of Harris.  The court found that it was more relevant on cross-examination than in the Government's case in chief, in part because evidence of the letter to Steven Jones, which also suggested attempts to influence a witness, had since been introduced.  The admissibility ruling was advisory only and intended to help Harris with his decision whether to take the

---

[8] The snipers, John Muhammad and Lee Malvo, were responsible for a shooting spree that took place in the suburbs of Washington D.C. over a period of three weeks in October 2002.  The shootings were "hit-and-run" attacks that "killed men and women at random as they went about the routine tasks of daily life," terrifying the capital region and ultimately claiming the lives of ten people and injuring three more.  Francis X. Clines & Christopher Drew, The Hunt for a Sniper: The Overview; With Two Held, Police Tie Rifle in Car to Sniper Killings, N.Y. Times, Oct. 25, 2002, at A1.

stand.  Harris did not object to the ruling at the time it was made.  Accordingly, we review for plain error.  See United States v. Parodi, 703 F.2d 768, 783 (4th Cir. 1983).

Under the plain error standard of review, to establish our authority to notice an error not preserved by a timely objection, a defendant must demonstrate (1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights.  United States v. Olano, 507 U.S. 725, 733-36 (1993).  If the defendant satisfies these threshold requirements, correction of the error is within our discretion, which is appropriately exercised "only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  United States v. Promise, 255 F.3d 150, 161 (4th Cir. 2001) (en banc) (quoting Olano, 507 U.S. at 736) (internal quotation marks omitted) (alteration in original)).  Although Harris contends that the challenged evidentiary ruling was in error, he makes no argument that any error was plain, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of the proceedings.  We therefore conclude that the district court's decision to allow cross examination of Harris regarding his photography was not plainly erroneous.

G.

Harris contends that his sentence was imposed in violation of his Sixth Amendment Right to trial by jury. In Booker, the Supreme Court held that a district court violates the Sixth Amendment when, acting pursuant to the mandatory Sentencing Guidelines, it imposes a sentence greater than the maximum authorized by the facts found by the jury or admitted by the defendant in a guilty plea. Booker, 543 U.S. at 244. Because Harris did not raise this objection at sentencing, we review for plain error. See Olano, 507 U.S. at 733-37. As discussed in subsection F, supra, on plain error review, we will reverse the district court only if we (1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.; United States v. Hughes, 401 F.3d 540, 547-49, 555 (4th Cir. 2005).

Harris contends that the district court made three factual findings related to the conspiracy count (Count One) that increased his sentence beyond that authorized by the facts found by the jury: (1) that he occupied an intermediate place in the conspiracy, warranting a two-level enhancement for his role in the conspiracy, (2) that the letter to Steven Jones constituted an attempt to influence a witness not to testify, warranting a one-level increase for obstruction of justice, and (3) that the quantity of drugs

33

attributable to Harris was within the five to fifteen kilogram range.

Both sentencing enhancements were based on factual findings by the district court and were imposed under the pre-Booker mandatory Guidelines. With regard to Harris's role in the conspiracy, the district court stated its view that "[Harris] falls somewhere between people like Mr. Berman and Mr. Walker on the top of the scale and the couriers on the bottom of the scale." (J.A. at 1208.) The district court then explained that "Harris should not be given a four level upward adjustment under 3B1.1," but that he "fits within subsection C, and therefore, I will increase [the sentence on Count One] by two levels based upon the evidence presented at trial and the arguments here at the sentencing." (J.A. at 1208.) With regard to the obstruction-of-justice enhancement, the district court found that although neither alleged act of obstruction of justice -- taking the photograph of Wright and sending the letter to Steven Jones -- was "clear-cut," the letter did "call[] upon the ties of friendship and past intimacy in an effort to persuade Jones not to testify in a harmful way." (J.A. at 1209.) Because judicial fact-finding increased Harris's sentence beyond the maximum sentence authorized by the jury verdict alone, we conclude that the resulting sentence is plainly erroneous. Although it is possible Harris would receive identical enhancements on remand, there is nothing in the record to compel

34

that conclusion.  Accordingly, we conclude that the exercise of our discretion to correct the error is warranted.  See Hughes, 401 F.3d at 556.

The calculation of Harris's base sentence, without the enhancements, was also the product of judicial fact-finding.  In order to determine the base offense level, the district court was required to determine the drug quantity attributable to Harris. The district court determined that "the proper range to place [] Harris in [wa]s Level 32, which is calculated with respect to between 5 to 15 kilograms of cocaine," describing the finding as "a difficult determination to make."  (J.A. at 1206.)  Because the jury did not make an individualized determination of the amount of drugs attributable to Harris with respect to the conspiracy, this factual finding increased Harris's sentence beyond the maximum authorized by the jury verdict alone.

Under our precedent, "specific threshold drug quantities must be treated as elements of aggravated drug trafficking offenses, rather than as mere sentencing factors."  Promise, 255 F.3d at 156. As a result, specific threshold quantities must be charged in the indictment and proven to the jury beyond a reasonable doubt.  Id. In this case, the district court did not treat the drug quantity as an element of the offense; it instructed the jury that to convict on Count One, it must find only two elements beyond a reasonable doubt (1) that the conspiracy described and charged in Count One

35

existed, and (2) that the defendant "knowingly, willfully, and voluntarily became a member of the conspiracy," (J.A. at 1088). The district court instructed the jury that "[t]he extent of a defendant's participation has no bearing on the issuance of a defendant's guilt," (J.A. at 1090), and went on to explain that, "[i]f you find that the government has proven a defendant guilty of the conspiracy charged in Count One, that is that the alleged conspiracy existed and that the defendant knowingly and intentionally became a member of the conspiracy, then you must determine beyond a reasonable doubt what type and quantity of controlled substances are attributable to the defendant," (J.A. at 1098). The jury verdict form, however, did not call for the jury to make an individualized determination of the drug quantity attributable to Harris. Instead, it simply provided for the jury to make a finding regarding that amount of cocaine attributable to the entire conspiracy. In explaining the form to the jury, the district court did not tell the jury to interpret the form as referring solely to the amount attributable to David Harris, but simply read the form to the jury.

Because the jury verdict form did not provide for the jury to make an individualized finding of the drug quantity attributable to Harris, the maximum penalty authorized by the jury verdict would ordinarily be the default penalty provision that applies when the amount of crack cocaine attributable to a defendant is less than 5

36

grams, 21 U.S.C.A. § 841(b)(1)(C).  See United States v. Collins, 415 F.3d 304, 314 (4th Cir. 2005).  The base offense level for conspiracy to distribute 5 grams of cocaine was 12.  U.S. Sentencing Guidelines Manual § 2D1.1(c)(14) (2002).  In this case, however, the jury found Harris guilty of possession with intent to distribute one kilogram of cocaine and of conspiracy to distribute cocaine, and the evidence that the kilogram of cocaine possessed by Harris was connected to the conspiracy was overwhelming.  We therefore conclude that calculating a base level using a drug quantity of up to 1 kilogram (which would provide for a base offense level of 26) would not affect Harris's substantial rights.  See Promise, 255 F.3d at 163.[9]  Because the district court, however, used the 5-15 kilogram range to assign Harris a base offense level of 32, and this resulted in a longer sentence than the maximum that would have been available under the Guidelines when using a base offense level of 26, the district court sentenced Harris in violation of his Sixth Amendment rights as articulated in Booker.[10]

---

[9]At sentencing, Harris's attorney stated that, "The jury did find that he possessed that one kilo in one of the counts, so I am not going to argue that particular one kilo," (J.A. at 1133), and asserted that the amount attributable to Harris was less than two kilograms -- the one kilogram found in Harris's luggage and a quantity of less than half a kilogram possessed by coconspirator Steven Jones, (J.A. at 1135-36).

[10]We note that there is no Apprendi error in this case with respect to Harris's underlying conspiracy conviction.  See Apprendi

H.

In addition to arguing that he should be resentenced in accordance with <u>Booker</u> and <u>Apprendi</u>, Harris also argues that he should not have received a sentencing enhancement for obstruction of justice. The government, in turn, argues that he should have received a greater enhancement for obstruction of justice than he did. Because sentencing post-<u>Booker</u> requires the district court to correctly calculate the Guidelines range as a first step, <u>see</u> <u>United States v. Moreland</u>, 437 F.3d 424, 432 (4th Cir. 2006), these issues are likely to arise again. We therefore address them at this time to prevent them from resurfacing.

1.

We review the district court's factual findings for clear error, but if the issue on review "turns primarily on the legal interpretation of a guideline term, . . . the standard moves closer to de novo review." <u>United States v. Daughtrey</u>, 874 F.2d 213, 217 (4th Cir. 1989).

---

<u>v. New Jersey</u>, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). The default penalty provision in 21 U.S.C.A. § 841(b)(1)(C) provides for a statutory maximum of 20 years, which increases to 30 years if the defendant has a prior conviction for a felony drug offense. Harris's sentence of 210 months on Count One does not exceed the statutory maximum.

The Government requested the obstruction-of-justice enhancement due to (1) Harris's having taken a picture of a government witness during a recess and (2) the letter Harris wrote to Steven Jones. Harris offered innocent explanations for both actions. The district court credited his explanation with regard to the photograph and did not use the picture-taking as a ground for the enhancement. Harris also asserted that he wrote the letter to Steven Jones not to dissuade Jones from testifying, but to urge him not to lie in order to save himself if he did choose to testify. The district court rejected that explanation, finding that although the letter was nonthreatening, it did "call[] upon the ties of friendship and past intimacy in an effort to persuade Jones not to testify in a harmful way." (J.A. at 1209.) The district court indicated that neither alleged act of obstruction of justice was clear cut and emphasized that Harris did not write the letter on his own initiative, but because Jones had instructed his wife to contact Harris. Still, the portions of the letter urging Jones not to "be the fuel to this . . . fire" or turn his back on someone who cares about him may be interpreted as attempting to convince a witness not to testify in a harmful way. Thus, we conclude that the district court's factual finding was not clearly erroneous.

The district court imposed a one-level enhancement for obstruction of justice, rather than the two level enhancement, because it found that the letter was nonthreatening, but was nevertheless an attempt to dissuade a witness from testifying. (J.A. at 39.) The Government argues that under the Guidelines, the enhancement is all or nothing, requiring the district court to impose a two-level enhancement or none at all. Our circuit has not previously spoken directly to this issue, but the Seventh Circuit has addressed it and agreed that U.S. Sentencing Guidelines Manual § 3C1.1 (2002) provides for two levels and two levels only. See United States v. Gilleylen, 81 F.3d 70, 72 (7th Cir. 1996) ("In formulating the guidelines, the Sentencing Commission certainly, if anything, knows how to departmentalize categories of aggravating and mitigating circumstances. . . . Had the Sentencing Commission wanted to permit gradations of obstructions, it certainly could have done so. It didn't, and we decline to authorize the reduction as a judicial rule."). We find the rationale of the Seventh Circuit persuasive, and therefore conclude that U.S.S.G. § 3C1.1 provides only for a two-level enhancement and does not permit gradations.

III.

In sum, we affirm Harris's convictions, finding no reversible error, but vacate his sentence and remand for resentencing in accordance with <u>Booker</u>.

<u>AFFIRMED IN PART;</u><br><u>VACATED AND REMANDED IN PART</u>

41